**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| IN RE: | CASE NO.  BK 17-80174-TLS |
| JN MEDICAL CORPORATION, | CHAPTER 11 |
| Debtor. | |

**DECLARATION OF SWAMI S. IYER IN SUPPORT OF THE
MOTION BY AURO VACCINES, LLC (I) TO DISMISS THE CHAPTER 11 CASE,
OR (II) IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY,
OR (III) IN THE ALTERNATIVE, FOR ADEQUATE PROTECTION**

I, Swami S. Iyer, under penalty of perjury, hereby declare as follows:

1.      I am the Chief Financial Officer of Auro Vaccines, LLC ("Auro").  In this capacity, I am familiar with Auro's business, operations, and financial affairs, including, among other things, the manufacture and storage of vaccines, and Auro's relationship with JN Medical Corporation (the "Debtor").

2.      I submit this declaration (this "Declaration") in support of the *Motion by Auro Vaccines, LLC (I) to Dismiss the Chapter 11 Case, or (II) in the Alternative, for Relief from the Automatic Stay, or (III) in the Alternative, for Adequate Protection* (the "Motion").

3.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of Auro's business, operations, and financial affairs, information learned from my review of relevant documents, information supplied to me by other members of Auro's management team and its advisors, or my opinion based upon my knowledge and experience or information I have reviewed concerning Auro's business, operations, and financial affairs.  I am over eighteen (18) years of age and I am authorized to submit this Declaration on behalf of Auro.  If called upon to testify, I could and would competently testify to

the facts set forth in this Declaration and the Motion based upon my own personal knowledge,
except as otherwise stated herein

4.      The Debtor and Auro are parties to a certain Loan, Guaranty and Security
Agreement, dated as of June 30, 2014 (the "Loan Agreement"), pursuant to which the Debtor
borrowed the principal amount of $3,500,000.  A copy of the Loan Agreement is attached as
Exhibit A to this Declaration.

5.      Auro is not an original party to the Loan Agreement.  Auro acquired all of its
rights and interests under the Loan Agreement from Great Elm Capital Corp. ("Great Elm").
Great Elm, in turn, acquired all of its rights and interest under the Loan Agreement from Full
Circle Capital Corporation ("Full Circle"), the original lender and party to the Loan Agreement.

6.      On November 3, 2016, Great Elm succeeded to all of Full Circle's rights and
interests under the Loan Agreement by operation of law pursuant to the merger of Full Circle
with and into Great Elm, under that certain Agreement and Plan of Merger, dated as of June 23,
2016, between Full Circle and Great Elm (the "Full Circle Agreement").  A copy of the Full
Circle Agreement is attached as Exhibit 2.1 to Full Circle's Current Report on Form 8-K filed
with the U.S. Securities and Exchange Commission on June 27, 2016.

7.      Effective February 3, 2017, Great Elm sold and assigned all of its rights and
interests under the Loan Agreement to Auro pursuant to that certain Asset Purchase Agreement
dated February 3, 2017 (the "Purchase Agreement") and that certain Assignment and
Assumption Agreement dated February 3, 2017 (the "Assignment Agreements").  Copies of the
Purchase Agreement and the Assignment Agreements are attached as Exhibit B and Exhibit C,
respectively, to this Declaration.

8.      On February 15, 2017 (the "Petition Date"), the Debtor filed its petition for

bankruptcy relief in this Court.

9.      As of the Petition Date, the Debtor owed Auro the principal amount of at least

$2,750,000, plus interest, fees, and costs (collectively, the "Loan Obligations") under the Loan

Agreement.

10.     The Loan Obligations are secured by a first-priority security interest in all of the

Debtor's assets (collectively, the "Collateral"), as provided in the Loan Agreement.  The

Collateral consists of all personal property and all intellectual property.

11.     On July 7, 2014, Full Circle perfected its security in the Collateral, as evidenced

by a Form UCC-1 Financing Statement (the "Full Circle Financing Statement") filed with the

Nebraska Secretary of State in accordance with the Uniform Commercial Code (the "UCC") as

adopted in Nebraska.  A copy of the Full Circle Financing Statement is attached as Exhibit D to

this Declaration.  On January 20, 2017, Great Elm filed a Form UCC-3 Financing Statement (the

"Great Elm Financing Statement") with the Nebraska Secretary of State in accordance with the

UCC, amending the Full Circle Financing Statement to reflect the change in the secured party's

name from Full Circle to Great Elm.  A copy of the Great Elm Financing Statement is attached

as Exhibit E to this Declaration.  On February 15, 2017, Auro filed a Form UCC-3 Financing

Statement (the "Auro Financing Statement" and together with the Full Circle Financing

Statement and the Great Elm Financing Statement, the "UCC Financing Statements") with the

Nebraska Secretary of State in accordance with the UCC, further amending the Full Circle

Financing Statement to reflect the assignment of Great Elm's security interest in the Collateral to

Auro.  A copy of the Auro Financing Statement is attached as Exhibit F to this Declaration.

Case 17-80174-TLS    Doc 22    Filed 03/03/17    Entered 03/03/17 18:21:58    Desc Main
Document    Page 4 of 102

12.     Originally, the Loan was also secured by certain real property, including three buildings thereon, in Douglas County, Nebraska (collectively, the "Real Property").  However, after the Debtor defaulted on the Loan Agreement in 2016 for failure to repay the Loan Obligations on the maturity date, Full Circle foreclosed on the Real Property pursuant to a valid non-judicial foreclosure sale and thereafter took ownership of the Real Property (the "Foreclosure Proceedings").  The Foreclosure Proceedings resulted in proceeds of $1,500,000, which were applied to expenses, interest, and principal.

13.     On February 3, 2017, Auro acquired all of Full Circle's right, title, and interest in (a) the Real Property pursuant to the Asset Purchase Agreement and a certain special warranty deed dated February 3, 2017 (the "Special Warranty Deed"), a copy of which is attached as Exhibit G to this Declaration, and (b) any tangible personal property that Full Circle may have acquired in the Foreclosure Proceedings (collectively, the "Personal Property") pursuant to the Asset Purchase Agreement and a certain bill of sale dated February 3, 2017 (the "Bill of Sale"), a copy of which is attached as Exhibit H to this Declaration.

14.     Auro is informed and believes that substantially all of the tangible Collateral is currently located on the Real Property and was not included in the Personal Property that Auro acquired from Great Elm.  Among other things, the Collateral includes certain proprietary vaccines and related cultures (collectively, the "Vaccines").  Importantly, the Vaccines are valuable, perishable, and require special care, storage, and ongoing maintenance, which the Debtor has not provided since February 6, 2016 and is unable to provide.

15.     Specifically, the Vaccines must be properly stored at certain specified temperatures to ensure and protect their survival, quality, utility, potency, and safety.  In accordance with guidelines promulgated by the U.S. Food and Drug Administration, the

Vaccines must be stored in coolers or refrigerators set at 2-8° Celsius.  Additionally, the

Vaccines include certain live seed cultures that are stored in nitrogen tanks, which have to be

refilled every 28 days to maintain these seed cultures.  Given their fragility, these seed cultures

are securely stored and must be handled with great care and precision.

16.      The Debtor has ceased operating its business and administering the Collateral—

including the Vaccines.  Since as early as February 6, 2016, the Debtor has made no effort to

preserve the Collateral.

17.      Due to the Debtor's unwillingness or inability to protect the Collateral, Auro

incurred costs and expenses in the aggregate amount of approximately $37,756 through

February 22, 2017 related to the protection and preservation of the Collateral located on the Real

Property—which includes costs for storage and the special care and maintenance required to

preserve and maintain the Vaccines.  All costs and expenses already incurred and all future costs

incurred by Auro in connection with preserving the Collateral are and will be included in the

Loan Obligations secured by the Collateral, in accordance with the Loan Agreement.

18.      Since the Petition Date, the Debtor continues to be derelict in its obligations to

protect and preserve the Collateral.  The Debtor does not appear to have any funds available to

pay for the postpetition maintenance, insurance, and security that are all necessary to adequately

preserve and protect the Collateral.

19.      Therefore, Auro must continue to protect, preserve, and maintain the Collateral

located on the Real Property.  Auro projects additional ongoing costs for preserving, protecting,

and maintaining the Collateral in the amount of approximately $23,000 per month.  These

ongoing costs and expenses materially diminish the value of Auro's interest in the Collateral.

20.     Immediately prior to the Petition Date, Auro was preparing to commence enforcement actions against the Collateral on account of the Debtor's continuing default under the Loan Agreement.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746(1), I declare under penalty of perjury that the foregoing is true and correct.

DATED this 2nd day of March, 2017.

                                                  Swami S. Iyer

# **EXHIBIT A**

## **LOAN AGREEMENT**

# LOAN, GUARANTY AND SECURITY AGREEMENT

**Dated as of June 30, 2014**

**By and Among**

**JN MEDICAL CORPORATION,**

**(as Borrower)**

**JEERI R. REDDY,**

**(as Guarantor)**

**and**

**FULL CIRCLE CAPITAL CORPORATION**

**(As Agent and as Lender)**

## TABLE OF CONTENTS

1.   DEFINITIONS. ........................................................................................................ 1

2.   BORROWING. ...................................................................................................... 7

3.   INTEREST AND FEES. ........................................................................................ 10

4.   REPRESENTATIONS AND WARRANTIES OF GRANTORS ............................ 12

5.   COLLATERAL. ..................................................................................................... 15

6.   FINANCIAL COVENANTS. . ............................................................................... 18

7.   COLLATERAL COVENANTS. ............................................................................ 18

8.   NEGATIVE COVENANTS. .................................................................................. 21

9.   REPORTING AND INFORMATION. .................................................................. 22

10.  INSPECTION RIGHTS; EXPENSES; ETC. ........................................................ 23

11.  RIGHTS OF SETOFF, APPLICATION OF PAYMENTS, ETC. .......................... 24

12.  ATTORNEY-IN-FACT ......................................................................................... 24

13.  DEFAULTS AND REMEDIES. ............................................................................ 24

14.  INDEMNIFICATION. ........................................................................................... 27

15.  GUARANTY. ......................................................................................................... 29

16.  GENERAL PROVISIONS. .................................................................................... 35

17.  AGENT. ................................................................................................................. 38

Attachments:

Schedule

Exhibit A – Funds Flow Memorandum

## LOAN, GUARANTY AND SECURITY AGREEMENT

This LOAN, GUARANTY AND SECURITY AGREEMENT (this "Agreement") is entered into as of June 30, 2014 by and among **JN MEDICAL CORPORATION**, a Nebraska corporation (hereinafter referred to individually as "Borrower") and **JEERI R. REDDY**, an individual (hereinafter referred to as "Guarantor"; Borrower and Guarantor are sometimes hereinafter referred to individually as a "Grantor" and collectively as the "Grantors") and **FULL CIRCLE CAPITAL CORPORATION**, a Maryland corporation, as a Lender (in such capacity, the "Lender"), and as agent (in such capacity, the "Agent").

### RECITALS:

WHEREAS, the Grantors have requested that Lender make a Term Loan (as hereinafter defined) to Borrower; and

WHEREAS, the Grantors acknowledge that the proceeds of the Term Loan made hereunder to the Borrower will, directly and indirectly, materially benefit Borrower and Grantors; and

WHEREAS, Lender is willing to make such Term Loan to Borrower on the terms set forth in this Agreement.

NOW, THEREFORE, Borrower, Agent and Lender hereby agree as follows:

**1.**     **Definitions.**  For purposes of this Agreement:

"Accounts" means all presently existing or hereafter arising accounts receivable due to any Grantor (including medical and health-care-insurance receivables), book debts, notes, drafts and acceptances and other forms of obligations now or hereafter owing to any Grantor, whether or not arising from the sale or lease of goods or the rendition of services by any Grantor (including any obligation that might be characterized as an account, contract right, general intangible or chattel paper under the UCC), all of each Grantor's rights in, to and under all purchase orders now or hereafter received by such Grantor for goods and services, all proceeds from the sale of Inventory, all monies due or to become due to any Grantor under all contracts for the sale or lease of goods or the rendition of services by such Grantor (whether or not yet earned) (including the right to receive the proceeds of said purchase orders and contracts), all Reserves and other reserve accounts or cash collateral held pursuant to this Agreement or any of the Loan Documents, all collateral security and guarantees of any kind given by any Loan Party with respect to any of the foregoing, all amounts payable to any Grantor under any insurance policy and all goods returned to or reclaimed by any Grantor that correspond to any of the foregoing, in each case together with all proceeds thereof.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, as the same may be amended from time to time.

"Bankruptcy Recourse Event" means any one or more of the following:  (i) if any Loan Party files a voluntary petition under the Bankruptcy Code or any other Creditors' Rights Law; (ii) if any Loan Party files, or joins in the filing of, an involuntary petition against any other Loan Party under the Bankruptcy Code or any other Creditors' Rights Law, or colludes or cooperates with any creditors to cause, or facilitates or coordinates, such filing, or solicits or causes to be solicited petitioning creditors for such involuntary petition against such Loan Party from any Person; (iii) any Loan Party files an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any

other Person under the Bankruptcy Code or any other Creditors' Rights Law; (iv) if any Loan Party consents to or acquiesces in or joins in an application for the appointment of a custodian, receiver, trustee, or examiner for any other Loan Party or all or any portion of the Collateral; (v) any Loan Party makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (vi) the substantive consolidation of any Loan Party with any other entity in connection with any proceeding under the Bankruptcy Code or any other Creditors' Rights Law; (vii) any Loan Party contesting or opposing any motion made by Agent or Lender to obtain relief from the automatic stay or seeking to reinstate the automatic stay in the event of any proceeding under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law involving Guarantor or its subsidiaries; and (viii) in the event Agent or Lender receives less than the full value of its claim in any proceeding under the Bankruptcy Code or any other Creditors' Rights Law, and any Loan Party or any of its Affiliates receiving an equity interest or other financial benefit of any kind in Borrower or any of the Collateral as a result of a "new value" plan or equity contribution.

"Borrower" has the meaning set forth in the preamble hereto.

"Borrower Collateral Accounts" has the meaning given to such term in **Section 7(k)**.

"Business Day" means any day excluding Saturday, Sunday, and any day which is a legal holiday under the laws of the State of New York or which is a day on which a Lender is otherwise closed for transacting business with the public.

"Change of Control" means the occurrence of one or more of the following events: (1) the sale, transfer or other disposition (in one transaction or a series of related transactions) of all or substantially all of the assets of any Grantor, or (2) at any time, Guarantor shall not have the legal and beneficial ownership, whether direct or indirect, of securities of Borrower representing in each case 100% of the voting and economic interest therein.

"Closing Date" means the date on which the Loan is funded.

"Collateral" has the meaning given to such term in **Section 5(a)**.

"Creditors' Rights Law" means any existing or future law (whether statute or case law) of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to debts or debtors, including, without limitation, the Bankruptcy Code.

"Customer" means any customer of any Grantor.

"Default" has the meaning set forth in **Section 13(a)**.

"Environmental Indemnity" means that certain Environmental Indemnity Agreement by Grantor, jointly and severally, to Agent for the benefit of Lender.

"Equipment" means all "equipment," as such term is defined in Article 9 of the UCC (hereinafter defined) now owned or hereafter acquired by Borrower (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board that are applicable to the circumstances as of the date of determination and applied on a consistent basis.

"General Intangibles" means all of Borrower's present and future general intangibles and all other presently owned or hereafter acquired intangible personal property of Borrower (including payment intangibles, all rights under insurance policies and any and all choses or things in action, goodwill, patents and patent applications, tradenames, servicemarks, trademarks and trademark applications, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, infringement claims, software, computer programs, computer discs, computer tapes, literature, reports, catalogs, deposit accounts, tax refunds and tax refund claims) other than Goods and Accounts, as well as Borrower's books and records relating to any of the foregoing.

"Goods" means all of Borrower's present and hereafter acquired goods, as defined in the UCC, wherever located, including imbedded software to the extent included in "goods" as defined in the UCC.

"Indebtedness" as applied to any Person, means, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to capital leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA and trade payables entered into in the ordinary course of business of such Person), which purchase price is (a) due more than 60 days from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument; (v) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person; (vi) the face amount of any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (vii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the indebtedness of another; (viii) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; and (ix) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (ix), the primary purpose or intent thereof is as described in clause (viii) above; and (x) obligations of such Person in respect of any exchange traded or over the counter derivative transaction.

"Indemnified Person" means each of Full Circle Capital Advisors, LLC, Full Circle Capital Corporation, any successor to either of them as Agent or Lender, any Affiliate of Agent or Lender who is or will have been involved in the origination or servicing of the Loan, Persons who may hold or acquire or will have held a full or partial interest in the Loan, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing.

"Inventory" means all of Borrower's inventory as defined in the UCC, together with all of Borrower's present and future inventory, including goods held for sale or lease or to be furnished under a contract of service and all of Borrower's present and future raw materials, work in process, finished goods, shelving and racking upon which the inventory is stored and packing and shipping materials, wherever located, and any documents of title representing any of the above.

"Lien" means any security interest, security title, mortgage, deed to secure debt, deed of trust, lien, pledge, charge, conditional sale or other title retention agreement, or other encumbrance of any kind in respect of any property, including the interest of each lessor under any capital lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or hereafter acquired and whether arising by agreement or operation of law.

"Loans" means (a) the Term Loan, and (b) any other extensions of credit made pursuant to **Section 2(i)** hereunder.

"Loan Document" means, individually or collectively, this Agreement and all other agreements, instruments, certificates and other documents executed and/or delivered in connection with this Agreement, including collateral documents, security agreements, pledges, guaranties, mortgages, deeds of trust, assignments, subordination agreements, intercreditor agreements and all other agreements executed and/or delivered by any Loan Party or any Affiliate of any Loan Party pursuant hereto or in connection herewith, in each case as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"Loan Party" means a Grantor, and "Loan Parties" means all of the foregoing Persons collectively.

"Material Adverse Effect" means a material adverse effect on: (a) the business, condition (financial or otherwise), assets, liabilities, or operations of any Loan Party, (b) the business, condition (financial or otherwise), assets, liabilities, or operations of the Borrower and its Subsidiaries, taken as a whole, (c) the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party, or (d) the validity or enforceability of this Agreement or the other Loan Documents against the Loan Parties or the rights or remedies of the Lender hereunder or thereunder.

"Maturity Date" means the date specified on **Item 7 of the Schedule**, as the same may be extended pursuant to Section 2(b) hereof.

"Mortgage" means that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated on or about the Closing Date, by Borrower for the benefit of Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Negotiable Collateral" means all of Borrower's rights in respect of present and future letters of credit, advises of credit, notes, drafts, instruments, and documents, including, without limitation, bills of lading, leases, and chattel paper, and Borrower's books and records relating to any of the foregoing.

"Note" means that certain Term Loan Note, dated on or about the Closing Date, by Borrower for the benefit of Lender, together with any substitute notes or severed notes delivered in lieu thereof, and any additional instruments evidencing the indebtedness of Borrower pursuant to this Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Obligations" means all Indebtedness, obligations and liabilities of each Grantor to the Agent and Lender under this Agreement and under each other Loan Document of every kind and description, direct

or indirect, secured or unsecured, joint or several, absolute or contingent, due or to become due, including any overdrafts, whether for payment or performance, now existing or hereafter arising, whether presently contemplated or not, regardless of how the same arise, or by what instrument, agreement or book account they may be evidenced, or whether evidenced by any instrument, agreement or book account, including, but not limited to, all loans (including any loan by modification, renewal or extension), all undertakings to take or refrain from taking any action, and all interest, taxes, fees, charges, expenses and attorney's fees (whether or not such attorney is a regularly salaried employee of a Lender or any of its Affiliates) chargeable to any Grantor or incurred by a Lender under this Agreement or any other document or instrument delivered in connection herewith.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended, together with the regulations promulgated from time to time thereunder.

"Permitted Investments" means investments in: (A) direct obligations of the United States of America maturing within one year from the acquisition thereof; (B) certificates of deposit issued by, or investment accounts in, banks or financial institutions having a net worth of not less than $50,000,000; and (C) commercial paper rated A-1 by Standard & Poor's Ratings Group or P-1 by Moody's Investors Service, Inc. Notwithstanding the foregoing, "Permitted Investments" (i) shall exclude any security with the S&P's "r" symbol (or any other rating agency's corresponding symbol) attached to the rating (indicating high volatility or dramatic fluctuations in their expected returns because of market risk), as well as any mortgage-backed securities and any security of the type commonly known as "strips"; (ii) shall be limited to those instruments that have a predetermined fixed dollar of principal due at maturity that cannot vary or change; and (iii) shall exclude any investment where the right to receive principal and interest derived from the underlying investment provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment. Interest may either be fixed or variable, and any variable interest must be tied to a single interest rate index plus a single fixed spread (if any), and move proportionately with that index. No investment shall be made which requires a payment above par for an obligation if the obligation may be prepaid at the option of the issuer thereof prior to its maturity. All investments shall mature or be redeemable upon the option of Agent on or prior to the earlier of (x) three months from the date of their purchase and (y) the Business Day preceding the day before the date such amounts are required to be applied hereunder.

"Permitted Liens" means (a) Liens or charges for current taxes, assessments or other governmental charges which are not delinquent, or the validity of which is contested in good faith by appropriate proceedings upon stay of execution of the enforcement thereof and for which appropriate reserves have been established in accordance with GAAP on the books and records of the Borrower; (b) letters of credit, deposits or pledges to secure (i) statutory obligations, (ii) surety or appeal bonds, (iii) bonds for release of attachment, stay of execution or injunction, or as otherwise may be required pursuant to applicable rule, regulation, statute or interpretation by any governmental authority; (c) statutory Liens on property arising in the ordinary course of business which, in the aggregate, do not materially impair the use of such property or materially detract from the value of such property; (d) Liens existing on the date hereof and described on **Item 3 of the Schedule**; (e) Liens consisting of pledges or deposits required in the ordinary course of business in connection with workers' compensation and unemployment insurance, (f) Liens on Equipment securing all or part of the purchase price of such Equipment provided, however, that (i) such Lien is created contemporaneously with the acquisition of such Equipment, (ii) such Lien attaches only to the specific items of Equipment so acquired, and (iii) such Lien secures only the indebtedness incurred to acquire such Equipment; (g) Liens in favor of the Agent securing the Obligations, (h) attachments, judgments and other similar Liens arising in connection with court

proceedings that do not constitute a Default, (i) easements, rights of way, restrictions (including zoning restrictions and covenants or conditions contained in licenses or agreements), encroachments, minor defects or irregularities in title and other similar matters as set forth in the title insurance policy issued to Agent in connection with the Mortgage, and (j) any interest or title of lessor under any lease or sublease not prohibited hereby.

"Person" means an individual, corporation, partnership, limited liability company, association, trust, unincorporated organization, government or any agency or political subdivision thereof, or any other entity.

"Property" has the meaning set forth in the Mortgage.

"Reserves" shall mean each of the reserve funds required to be established by Borrower pursuant to this Agreement, and all proceeds thereof.

"Sanctioned Entity" means (a) an agency of the government of, (b) an organization directly or indirectly controlled by, or (c) a person resident in a country that is subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/programs, or as otherwise published from time to time as such program may be applicable to such agency, organization or person.

"Sale or Pledge" means a voluntary or involuntary sale, conveyance, assignment, transfer, encumbrance, mortgage, grant of a trust deed or security deed, Lien, security interest, pledge, grant of option or other disposal of a legal or beneficial interest, whether direct or indirect.

"Sanctioned Person" means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at http://www.treas.gov/offices/ enforcement/ofac/sdn/index.html, or as otherwise published from time to time.

"Subsidiary" means, as to any Person, any corporation, partnership, limited liability company or other entity of which more than fifty percent (50%) of the outstanding capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other managers of such corporation, partnership, limited liability company or other entity is at the time, directly or indirectly, owned by such Person (irrespective of whether, at the time, capital stock or other ownership interests of any other class or classes of such corporation or other entity shall have or might have voting power by reason of the happening of any contingency). Unless otherwise qualified, references to "Subsidiary" or "Subsidiaries" herein shall refer to those of a Borrower.

"Tangible Net Worth" means, at any date, and determined for the Guarantor and its Subsidiaries on a consolidated basis, the amount by which the total tangible assets exceed the total liabilities, with total tangible assets being defined as total assets of Guarantor and its Subsidiaries less (i) goodwill, (ii) the amount by which the cost of any acquisition of an asset exceeds the fair market value thereof, and (iii) all other items classified as "intangible assets" in accordance with GAAP, as reported on the Guarantor's consolidated and combined financial statements as of such date.

"Term Loan" shall have the meaning set forth in **Section 2(a)(i)** hereof.

"Term Loan Commitment" means $3,500,000.00.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection

with the issue of perfection of security interests; provided, however, that to the extent that the UCC is used to define any term herein or in any other documents and such term is defined differently in different Articles or Divisions of the UCC, the definition of such term contained in Article or Division 9 shall govern.

**Other Definitional Provisions.** References to the "Schedule" or any "Section" or "Exhibit" refer to the Schedule or a section or exhibit, respectively, of this Agreement unless otherwise specifically provided. Any of the terms defined in **Section 1** may, unless the context otherwise requires, be used in the singular or the plural depending on the reference. In this Agreement: words importing any gender include the other genders; the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to agreements and other contractual instruments shall be deemed to include subsequent amendments, assignments, and other modifications thereto, but only to the extent such amendments, assignments and other modifications are not prohibited by the terms of this Agreement; references to any Person includes their respective permitted successors and assigns or people succeeding to the relevant functions of such Persons; any and all terms which are defined in the UCC and are not defined herein shall be construed and defined in accordance with the definition of such terms under the UCC; accounting terms not defined herein shall have the respective meanings given them under GAAP; all accounting computations and presentations shall be performed in accordance with GAAP; all references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations; all references to time of day shall refer to New York, New York time; and all references to Obligations of Borrower shall mean the joint and several obligations of the Grantors, including the Borrower.

2.     **Borrowing.**

(a)     **Term Loan**.

(i)     Subject to the terms and conditions of this Agreement, Borrower hereby requests, and the Lender agrees to make, a term loan in an amount equal to the Term Loan Commitment, to or for the benefit of Borrower, in one advance on the Closing Date (the "Term Loan").

(ii)     Amounts borrowed under this **Section 2(a)** and repaid or prepaid may not be reborrowed.

(b)     **Maturity.** The entire unpaid balance of the Term Loan and all other Obligations shall be due and payable on the Maturity Date. Borrower shall have a one-time option (the "Option to Extend") to extend the term of the Term Loan from the Maturity Date (referred to herein as the "Original Maturity Date") for an additional period of twelve (12) months (the last day of such period being referred to as the "Extended Maturity Date"), upon satisfaction of each of the following conditions precedent:

(i)     Borrower shall provide Agent with irrevocable written notice of Borrower's request to exercise the Option to Extend not more than sixty (60) days but not less than thirty (30) days prior to the then-current Maturity Date;

(ii)     As of the date of Borrower's delivery of notice of request to exercise the Option to Extend, and as of the then-current Maturity Date, no Default shall have occurred and be continuing, and Borrower shall so certify in writing;

(iii)     No event has occurred which has had, or is reasonably likely to have, a Material Adverse Effect, as determined by Agent in its reasonable discretion;

{00892255;5}                                     7

(iv)  Concurrently with the delivery of the notice referred to above, Borrower shall pay to Lender an extension fee in an amount equal to one percent (1.0%) of the then-outstanding principal balance of the Term Loan;

(v)  Borrower shall execute or cause the execution of all documents required by Agent in connection with the exercise of the Option to Extend and shall deliver to Agent, at Grantors' sole cost and expense, such legal opinions and title insurance endorsements as are reasonably required by Lender; and

(vi)  Borrower shall pay all of Agent's and Lender's reasonable out-of-pocket costs and expenses in connection with Option to Extend.

(c)  **Conditions to Obligation to Make Term Loan**.  Borrower acknowledges that Lender's obligation to make the Term Loan is subject to the following terms and conditions:

(i)  Lender has no obligation to make the Term Loan to Borrower unless and until (A) each Grantor delivers to Lender, in form and substance satisfactory to Lender in its discretion, each agreement, instrument, legal opinion and other document specified on **Item 6 of the Schedule**, as applicable, unless waived by the Lender, and (B) each other condition precedent specified on **Item 6 of the Schedule** has been satisfied or waived in a manner satisfactory to Lender in its discretion.

(ii)  Lender's obligation to make the Term Loan to Borrower on the Closing Date is subject to the additional conditions that, as of such date, no Default will have occurred and be continuing hereunder, there will have occurred no Material Adverse Effect and each Grantor's representations and warranties set forth in this Agreement (including any amendment, modification, supplement or extension hereof) and the other Loan Documents will be true and correct in all material respects on the Closing Date as if made on and as such date unless such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date.

(iii)  Other than the Lender's commitment to make the Term Loan to Borrower, which is subject to the terms and conditions set forth herein and in the other Loan Documents, Lender has no commitment or obligation to make any other loans or financial accommodations to Borrower or any other Grantor.

(d)  **Repayment of Loans**.  Upon termination of this Agreement, or upon demand by Agent upon Default, (subject to any grace periods or notice periods specified herein), Borrower will repay upon demand all of the Obligations.  If no demand is earlier made, Borrower will repay all Obligations in full, without demand or notice, on the maturity date provided for in **Item 7 of the Schedule**.  If at any time for any reason, the aggregate outstanding principal amount of the Term Loan exceeds the Term Loan Commitment, Borrower will immediately, and without notice or demand, repay the outstanding principal amount of the Term Loan, together with accrued and unpaid interest on the amount repaid, in an amount equal to such excess (it being understood that such excess amount, regardless of how it arose, shall nevertheless constitute an Obligation hereunder and be secured by all of the Collateral).  Borrower shall make each payment required hereunder or under any other Loan Document without setoff, deduction or counterclaim.

Upon the occurrence and during the continuance of a Default and acceleration of the Term Loan by the Lender in accordance with this Agreement, Borrower shall pay all of the Obligations at the prepayment premiums set forth in **Item 10(b) of the Schedule** upon demand (except in the case of a

Default specified in **Section 13(a)(vi)** in which case such amounts shall become automatically due immediately upon such occurrence).

(e)      **Termination of Agreement**. This Agreement will continue in full force and effect from the date hereof until the Term Loan and all other Obligations have been repaid in their entirety.

(f)      **Prepayments, Voluntary Termination.** Borrower may elect to prepay the Term Loan in minimum amounts of $500,000 at any time after the Closing Date upon at least ten (10) days' prior written notice to Agent, in the case of a partial prepayment, and at least thirty (30) days' prior written notice to Agent, in the case of prepayment of the Term Loan in full, together with the applicable prepayment premiums as set forth in **Item 10(b) of the Schedule**. In the case of prepayment in whole, on the date specified in such notice, termination of this Agreement will be effective so long as the Borrower shall have paid to Lender, in same day funds, an amount equal to the aggregate principal amount of the Term Loan outstanding on such date, together with accrued interest thereon, all other Obligations outstanding and unpaid shall have been paid in full in cash.

(g)      **Termination on Default**. Notwithstanding the foregoing, should a Default occur and be continuing (giving effect to applicable grace periods and cure rights), Lender will have the right to terminate this Agreement at any time without prior notice.

(h)      **Survival**. Notwithstanding termination of this Agreement, all the terms, conditions, and provisions hereof (including Agent's security interest in the Collateral, but excluding any obligations of Agent or Lender hereunder) will continue to be fully operative until all Obligations have been fully disposed of, concluded, paid and satisfied. Agent shall have no obligation to release its Liens on any Collateral until the Obligations have been repaid in full in cash in immediately available funds.

(i)      **Payments as Loans**. At any time when the Obligations remain outstanding, if Agent, with the consent of Lender, determines in its discretion that extensions of credit are necessary to protect the Collateral or to enhance the likelihood of repayment in full of the Obligations, Agent is hereby authorized, but not required, to make such extensions of credit (whether or not Agent shall have previously terminated this Agreement) and charge them to Borrower's loan account whereupon such extension of credit shall be deemed part of the Obligations secured by the Collateral.

(j)      **Mandatory Repayment**.

(i)      **Sales of Assets; Insurance Proceeds; Indebtedness**. Borrower shall promptly prepay the Term Loan in an amount equal to one hundred percent (100%) of the net proceeds from (w) any issuance of new equity interests by or in Borrower or any owner of Borrower, (x) any sale of assets of Borrower or any Subsidiary outside its ordinary course of business, to the extent the same are not reinvested in such Person's business within one hundred eighty (180) days following receipt thereof, (y) from casualty insurance claims or from any condemnation proceeds received by Borrower or a Subsidiary, to the extent the same are not reinvested in such Person's business within one hundred eighty (180) days following receipt thereof, and (z) from the proceeds of incurrence of Indebtedness not permitted hereunder and any such prepayments are subject to prepayment pricing as set forth in **Item 10(b) of the Schedule**.

(ii)      **Amortization**. The Term Loan will not amortize, and will be due and payable on the date set forth on **Item 7 of the Schedule**.

(k)      **Application of Amounts.** Except or otherwise specified herein, all payments and any other amounts received by the Agent from or for the benefit of Borrower shall be applied first to any

outstanding fees, expenses and interest, hereunder and then all payments and any other amounts received by the Agent from or for the benefit of Borrower, shall be applied to repay the outstanding principal amount of the Term Loan. All prepayments applied to the Term Loan for any reason are subject to the prepayment premiums as set forth in **Item 10(b) of the Schedule**. Upon the occurrence and during the continuance of a Default, Agent shall be entitled to apply any and all proceeds of any payments and any other amounts received by the Agent from or for the benefit of Borrower, in Agent's sole and absolute discretion.

3.      **Interest and Fees.**

(a)      **Interest on Term Loan**. Borrower will pay Lender interest on the average daily principal amount of the Term Loan outstanding hereunder, calculated monthly and payable in arrears on the first day of each calendar month by 11:00 am New York City time, at a rate (computed on the basis of the actual number of days elapsed over a year of 360 days) equal to the sum of (i) LIBOR (as defined below), plus (ii) the interest margin specified in **Item 8 of the Schedule** (the "Interest Margin"). LIBOR may not be the lowest or best rate at which a Lender calculates interest or extends credit. LIBOR for each calendar month shall be adjusted (if necessary) on the first day of such calendar month and shall be equal to LIBOR in effect as of the close of business on the last Business Day of the immediately preceding calendar month. As used herein, "LIBOR" means, at any time, an interest rate per annum equal to the interest rate per annum (rounded upwards, if necessary, to the nearest $1/100^{th}$ of 1%) as published in the "Money Rates" section of The Wall Street Journal (or another national publication reasonably selected by Lender) as the one-month London Interbank Offered Rate for United States dollar deposits (or, if such page shall cease to be publicly available or, if the information/description contained on such page, in Lender's sole judgment, shall cease to accurately reflect such London Interbank Offered Rate, then such rate as reported by any publicly available recognized source of similar market data selected by Lender that, in Lender's reasonable judgment, accurately reflects such London Interbank Offered Rate). Notwithstanding the foregoing, (y) to induce Agent and Lender to make the Loan, and to compensate Lender for any delay arising from Borrower's failure to borrow the full principal amount of the Term Loan on the date of this Agreement, Borrower shall pay interest on the stated amount of the Term Loan beginning on the date of this Agreement, whether or not the Term Loan is outstanding, and (z) in no event shall LIBOR at any time be less than one-quarter of one percent (0.25%) per annum nor greater than two and one-quarter percent (2.25%).

(b)      **Market Disruption Event**. If, at any time, Lender determines (which determination shall be conclusive and binding) that (i) by reason of circumstances affecting the London interbank market generally, adequate and fair means do not exist for ascertaining LIBOR for the following month as provided in subsection (a) hereof, or (ii) disruptions in the short term money markets have materially and adversely affected Lender's cost of funds such that the interest rate hereunder does not adequately or fairly reflect Lender's cost of making, funding or maintaining the Loan hereunder, a "Market Disruption Event" will be deemed to have occurred and Lender shall promptly notify Borrower thereof. The rate of interest hereunder (the "Adjusted Rate of Interest") shall be adjusted and shall thereafter be a rate equal to the sum of (x) the rate that Lender determines (which determination shall be conclusive and binding), expressed as a percentage rate per annum, to be the cost to Lender of funding the loan from whatever source it may reasonably elect, plus (y) the Interest Margin. Lender shall give prompt notice to Borrower of the Adjusted Rate of Interest. Borrower shall begin to be charged interest at the Adjusted Rate of Interest effective as of the first day of the month following the month in which Lender provides notice thereof to Borrower.

(c)      **Default Interest**. To the extent permitted by law and without limiting any other right or remedy of Lender hereunder, whenever there is a Default occurring and continuing under this Agreement, the rate of interest on the unpaid principal balance of the Obligations shall, at the option of Lender, be

increased by adding the Default Margin identified on **Item 9 of the Schedule** to the interest rate otherwise in effect hereunder. Lender may charge such default interest rate retroactively beginning on the date the applicable Default first occurred or existed. Borrower acknowledges that: (i) such additional rate is a material inducement to Lender to make the Loan described herein; (ii) Lender would not have made the Loan in the absence of the agreement of Borrower to pay such additional rate; (iii) such additional rate represents compensation for increased risk to Lender that the Loan will not be repaid; and (iv) such rate is not a penalty and represents a reasonable estimate of (A) the cost to Lender in allocating its resources (both personnel and financial) to the ongoing review, monitoring, administration and collection of the Loan, and (B) compensation to Lender for losses that are difficult to ascertain. In the event of termination of this Agreement by either party hereto, Lender's entitlement to this charge will continue until all Obligations are paid in full.

(d)    **Fees**. Borrower will pay to Lender the fees set forth in **Item 10 of the Schedule**, and as otherwise set forth in the Fee Letter.

(e)    **No Usury**. Borrower acknowledges that Lender does not intend to reserve, charge or collect interest on money borrowed under this Agreement at any rate in excess of the rates permitted by applicable law and that, should any interest rate provided for in this Agreement exceed the legally permissible rate(s), the rate will automatically be reduced to the maximum rate permitted under applicable law. If Lender should collect any amount from Borrower which, if it were interest, would result in the interest rate charged hereunder exceeding the maximum rate permitted by applicable law, such amount will be applied to reduce principal of the Obligations or, if no Obligations remain outstanding, will be refunded to Borrower.

(f)    **Monthly Statements**. Agent will render a statement to Borrower each month reflecting the outstanding amount of the Loan, payments, and other transactions pursuant to this Agreement, and such statement rendered by Agent will be binding upon Borrower unless Agent is notified in writing to the contrary within 30 days after the date such statement is rendered.

(g)    **Late Payments**. In addition to the rights and remedies available to Agent and Lender hereunder in the event any payment is not made as and when required hereunder, Borrower shall be required to pay to Agent an additional charge equal to five percent (5%) of the amount of such payment, which late payment charge is not a penalty but represents a reasonable estimate of (A) the cost to Agent in allocating its resources (both personnel and financial) to the ongoing review, monitoring, administration and collection of the Loan following such Default, and (B) compensation to Agent for losses that are difficult to ascertain.

(h)    **Mandatory Minimum Interest Payment**. NOTWITHSTANDING THE PROVISIONS OF SECTIONS 2(f) OF THIS AGREEMENT, as a material inducement to Agent and Lender to enter into this Agreement and make the Term Loan, Borrower agrees that it shall be obligated to pay interest on the Term Loan in the amount of not less than $390,000.00 over the term of the Term Loan. If as of the repayment in full of the Term Loan, the aggregate amount of all interest paid from time to time (excluding Default Interest pursuant to Section 3(c) above) is less than $390,000 (by reason of Borrower's exercising any right to prepay the Term Loan, in whole or in part), then as compensation to Lender for the early repayment of the principal amount of the Term Loan, Borrower shall be required to make an additional payment in the amount of $390,000 less all interest payments (other than Default Interest as aforesaid) made during the term of the Term Loan; such additional payment is liquidated damages for the early repayment of the Term Loan, and not a penalty, it being agreed by Grantor and Lender that Lender's damages by reason of early repayment of the Term Loan are impossible to calculate. If, at any time, Agent or Lender determines that accepting a prepayment would operate to cause the provisions of this

Section 3(h) to give rise to an obligation to refund such prepayment pursuant to Section 3(e) above, then Borrower shall defer making such prepayment.

4. **Representations and Warranties of Grantors**

(a) **Authority, Compliance with Laws, Litigation, No Material Adverse Change, Etc.** Grantors, jointly and severally, represent and warrant to Agent and Lender that:

(i)     each Grantor's exact legal name, type of organization, state of organization and organizational identification number are fully and accurately set forth on **Item 11 of the Schedule**, and each Grantor is duly organized and validly existing under the laws of such state of organization or incorporation;

(ii)     the execution, delivery, and performance of this Agreement and the other Loan Documents (A) are within each Grantor's corporate or limited liability company powers, (B) have been duly authorized, (C) do not violate such Grantor's constituent documents, (D) (x) do not violate any law or regulation, including without limitation, any law or regulation relating to occupational health and safety or protection of the environment applicable to such Grantor, or (y) any indenture, agreement, or other undertaking to which such Grantor is a party or by which such Grantor or such Grantor's property is bound, except in the case of this clause (D) as would not cause a Material Adverse Effect;

(iii)     this Agreement and the other Loan Documents to which each Grantor is a party constitute valid, binding and enforceable obligations of such Grantor in accordance with the terms hereof and thereof, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, moratorium or other similar laws applicable to creditors' rights generally or by generally applicable equitable principles affecting the enforcement of creditors' rights;

(iv)     Borrower has no direct or indirect Subsidiaries or other investments in other Persons, except as set forth on **Item 12 of the Schedule**;

(v)     each Grantor is in compliance in all material respects with all laws, rules and regulations applicable to such Person, including laws, rules or regulations concerning the environment, occupational health and safety and pensions or other employee benefits;

(vi)     except as set forth on **Item 13 of the Schedule**, there is no litigation or investigation pending against such Grantor (or, so far as such Grantor is aware, threatened in writing) which could reasonably be expected to have a Material Adverse Effect (taking into account any insurance coverage that has been acknowledged by the insurer);

(vii)     other than debt that is to be repaid from the proceeds of the Loan hereunder, Borrower is not indebted to any other Person for money borrowed nor has Borrower issued any guaranty of payment or performance to any other Person, except as permitted hereunder or as set forth on **Item 14 of the Schedule**;

(viii)     since December 31, 2013, there has been no Material Adverse Effect; and

(ix)     each Grantor is, and after giving effect to the making of the Loan under this Agreement and the application of the proceeds of such Loan, such Grantor will be, solvent and has sufficient revenues to pay such Grantor's obligations as they come due and adequate capital with which to conduct such Grantor's business.

(b)    **Title to Assets, Other Collateral Matters**.  In addition to the representations and warranties with respect to the Property as set forth in the Mortgage, Borrower represents and warrants to Agent and Lender that:  (i) Borrower has good and valid title to the Collateral, free of all Liens except for Permitted Liens, and no financing statement, mortgage, notice of Lien, deed of trust, security agreement, or any other agreement or instrument creating or giving notice of any Lien against any of the Collateral has been signed, authorized or delivered by Borrower, except in Lender's favor or with respect to Permitted Liens; (ii) with regard to each Account included in the Collateral as it arises, Borrower will have made delivery of the goods or will have rendered the services ordered; (iii) all Inventory meets all applicable material governmental standards and is currently usable or saleable in the ordinary course of Borrower's business; (iv) all Equipment is in working condition and state of repair, ordinary wear and tear excepted; (v) all Collateral meets applicable material government standards in all material respects; (vi) in the past five years, except as set forth on **Item 15 of the Schedule** (A) Borrower has not used any other legal, trade or fictitious names, and (B) Borrower has not been a party to any merger or purchased assets from any other Person other than (x) in the ordinary course of business, (y) acquisitions of equity interests of other Persons, and (z) purchases of equipment from manufacturers thereof; and (vii) each of such Grantor's chief executive office and principal place of business, all Inventory, all Equipment and all other physical Collateral is located at the addresses (including the county) set forth on **Item 16 of the Schedule**.

(c)    **Ownership Structure**.  Grantors represent and warrant that (i) **Item 17 of the Schedule** accurately describes the ownership of each Grantor's capital stock, membership interests or other equity interests, and (ii) the entities listed on **Item 17 of the Schedule** have, directly or indirectly, voting and managerial control of Borrower.

(d)    **Additional Representations**.  Grantors, jointly and severally, represent and warrant to Agent and Lender that: (i) no Grantor is engaged as one of its principal activities in owning, carrying or financing the purchase or ownership by others of "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System); (ii) no Grantor owns real property or leases real property other than as listed on **Item 18 of the Schedule**; and (iii) a true, correct and complete list of any warehousemen, processors, consignees or other bailees with possession or control of any Inventory is set forth on **Item 18 of the Schedule**.

(e)    **Intellectual Property**.  Grantors, jointly and severally, represent and warrant to Agent and Lender that (i) **Item 19A of the Schedule** sets out a complete and accurate list of patents, trademarks, trade names and copyrights that Borrower owns, is licensed or otherwise has the lawful right to use that is material to its business, (ii) Borrower owns, is licensed or otherwise has the lawful right to use the permits and other governmental approvals, patents, trademarks, trade names, copyrights, technology, know-how and processes necessary and sufficient for the conduct of its business as currently conducted which are material to its business, (iii) there are no claims pending or, to any Grantor's knowledge, threatened in writing, that any Grantor is infringing or otherwise adversely affecting the rights of any Person with respect to such permits and other governmental approvals, patents, trademarks, trade names, copyrights, technology, know-how and processes, except for such claims and infringements as do not, in the aggregate, give rise to any material liability on the part of any Grantor, which has or is reasonably likely to have a Material Adverse Effect and (iv) the consummation of the transactions contemplated by the Loan Documents will not impair Borrower's ownership for rights under (or the license or other right to use, as the case may be) any permits and governmental approvals, patents, trademarks, trade names, copyrights, technology, know-how or processes in any manner which has or is reasonably likely to have a Material Adverse Effect.

(f)    **Foreign Assets Control Regulations; Anti-Money Laundering and FCPA**.

(i)    No Loan Party or any Affiliate thereof: (a) is a Sanctioned Person, (b) has any assets in Sanctioned Entities, or (c) derives any operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. The proceeds of the Loan will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

(ii)    Each Grantor is in compliance, in all material respects, with the Patriot Act. No part of the proceeds of the Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(g)    **Labor.** Except as disclosed on **Item 19B of the Schedule**:

(i)    There is no collective bargaining agreement or relationship between any Grantor and any labor organization;

(ii)    no labor organization or group of employees has filed any representation petition or made any written or oral demand for recognition with any Grantor;

(iii)    to the knowledge of the Grantors, no union organizing or decertification efforts are underway or threatened and no other question concerning representation exists; and

(iv)    no labor strike, work stoppage, slowdown, or other material labor dispute has occurred, and none is underway or, to the knowledge of any Grantor, threatened.

(h)    **Assurances**. This Agreement, together with all exhibits and schedules hereto, the Loan Documents, and the documents, agreements and financial statements furnished to the Lender by any Grantor do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were made, not misleading; provided that with respect to any projections or forward-looking statements provided, the Grantors only represent that such were prepared based on reasonable estimates.

(i)    **No Material Adverse Effect.** To the knowledge of the Grantors, there is no fact which the Grantors have not disclosed to the Lender in writing which could be expected to have a Material Adverse Effect.

(j)    **Financial Condition.** The balance sheet of Borrower as of December 31, 2013 and the related statements of income, retained earnings and cash flows for the period then ended, heretofore delivered to the Lender or to be delivered to Lender, are complete and correct and fairly present, on a consolidated and combined basis, the financial condition of Borrower and the results of its operations and changes in its financial position as of the date and for the period referred to therein and have been prepared in accordance with GAAP. There are no consolidated and combined liabilities, direct or indirect, fixed or contingent, of Borrower, as of the dates of such balance sheet required to be disclosed under GAAP that are not reflected therein or in the notes thereto. There has been no Material Adverse Change since December 31, 2013.

5.      **Collateral; Grant of Security Interest by Borrower; Reserve Accounts.**

(a)      **Security Agreement – Grant of Security Interest**.  To induce Agent and Lender to accept this Agreement and to make the Loan to Borrower pursuant to the terms of this Agreement, Borrower hereby grants to Agent, for the benefit of Lender, a security interest in, and assigns, mortgages and pledges to Lender, for itself and as agent for any Affiliate of Lender, all of Borrower's right, title and interest in and to the following property of Borrower, whether real or personal, tangible or intangible, now owned or existing or hereafter acquired or arising (collectively, the "Collateral"):

(i)      all Accounts, Inventory, Equipment, Goods, General Intangibles and Negotiable Collateral;

(ii)      all investment property, securities and securities accounts and financial assets, as well as all bank and depository accounts (including without limitation the Borrower Collateral Accounts) and all funds on deposit therein;

(iii)      all chattel paper (whether tangible or electronic) and contract rights;

(iv)      all guaranties, collateral, Liens on real or personal property, leases, letters of credit, supporting obligations, and all other rights, agreements, and property securing or relating to payment of Accounts or any other Collateral;

(v)      all documents, books and records relating to any Collateral or to Borrower's business;

(vi)      all other property of Borrower now or hereafter in the possession or control of a Lender or any of such Lender's Affiliates (including cash, money, credits and balances of Borrower held by or on deposit with Lender or any Affiliate of a Lender);

(vii)      all of Borrower's commercial tort claims listed on (A) **Item 20 of the Schedule** (which Borrower represents and warrants is a true, accurate and complete list of all of such Grantor's known commercial tort claims as of the date hereof) or (B) any other writing provided to Lender pursuant to **Section 7(e)**;

(viii)      all patents, trademarks, royalty rights, copyrights, technology, know-how and other intellectual property, which shall be listed on **Item 19A of the Schedule**;

(ix)      all other property of Borrower whether governed by Article 9 of the UCC or other law;

(x)      any Reserve required by this Agreement; and

(xi)      all proceeds and products of all of the foregoing in any form, including amounts payable under any policies of insurance insuring all or any of the foregoing against loss or damage, all parts, accessories, attachments, special tools, additions, replacements, substitutions and accessions to or for all or any of the foregoing, all condemnation or requisition payments with respect to all or any of the foregoing and all increases and profits received from all or any of the foregoing.

(b)      **Obligations**.  Such grants, assignments, mortgages and transfers are made for the purpose of securing, and the Collateral secures and will continue to secure, all of the Obligations.

(c)    **Reserves**.  As additional security for the Obligations, Borrower shall be required to establish the following Reserves to be held by Agent:

(1)    Interest Reserve.  A portion of the principal amount of the Term Loan equal to Three Hundred Ninety Thousand and 00/100 Dollars ($390,000.00) shall be advanced by Lender to Agent on the Closing Date and held as a Reserve (referred to herein as the "Interest Reserve") pursuant to this Agreement.  Any amount so advanced shall be deemed disbursed to Borrower as of the Closing Date.  The proceeds of the Interest Reserve shall be made available for payment of interest payments on the Term Loan, as and when due, *provided, however*, that Agent shall have no obligation to release any funds from the Interest Reserve if any default is then continuing hereunder.  Neither the lack of availability of funds in the Interest Reserve nor the failure of Borrower to qualify for the release of proceeds therefrom shall release Borrower from any of its obligations under the Loan Documents, including, without limitation, the payment of all interest as and when due.

(2)    Tax Reserve.  Upon notice from Agent (which may be given at any time during the continuance of a Default), Borrower shall be required to establish a Reserve on account of taxes payable with respect to the Property (such Reserve, the "**Tax Reserve**").  On the first day of each month following the giving of such notice by Agent, until the Term Loan is paid in full in accordance with this Agreement, Borrower shall pay to Agent one-twelfth of the taxes that Agent estimates (in its reasonable judgment) will be payable during the next ensuing twelve (12) months, in order to accumulate with Agent sufficient funds to pay all such taxes at least thirty (30) days prior to their respective due dates.  Within ten (10) days after the giving of such notice by Agent, Borrower shall make an additional deposit to the Tax Reserve such that (when combined with the monthly deposits each month until the due date of such taxes) Agent shall have on deposit sufficient funds to pay all such taxes as aforesaid.  Provided no Default is continuing, Agent will apply the Tax Reserve to payments of taxes required to be made by Borrower pursuant to this Agreement.  In making any payment from the Tax Reserve, Agent may do so according to any bill, statement or estimate procured from the appropriate public office, without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If at any time Agent reasonably determines that the Tax Reserve is not or will not be sufficient to pay taxes by the dates set forth above, Agent shall notify Borrower of such determination and within ten (10) days of such notice, Borrower shall make an additional deposit with respect to such insufficiency and/or increase its monthly payments to Agent by the amount that Agent estimates is sufficient to make up the deficiency at least thirty (30) days prior to the due date of the taxes.  Neither the lack of availability of funds in the Tax Reserve nor the failure of Borrower to qualify for the release of proceeds therefrom shall release Borrower from any of its obligations under the Loan Documents, including, without limitation, the payment of all taxes on the Property as and when due.

(3)    Insurance Reserve.  Upon notice from Agent (which may be given at any time during the continuance of a Default), Borrower shall be required to establish a Reserve on account of premiums with respect to insurance coverages required to be maintained by Borrower (such Reserve, the "**Insurance Reserve**").  On the first day of each month following the giving of such notice by Agent, until the Term Loan is paid in full in accordance with this Agreement, Borrower shall pay to Agent one-twelfth of the insurance premiums that Agent estimates (in its reasonable judgment) will be payable during the next ensuing twelve (12) months, in order to accumulate with Agent sufficient funds to pay all such insurance premiums at least thirty (30) days prior to their respective due dates.  Provided no Default is continuing, Agent will apply the Insurance Reserve to payments of insurance premiums required to be made by Borrower pursuant to this Agreement.  In making any payment from the Insurance Reserve, Agent may do so

according to any bill, statement or estimate procured from the appropriate or insurer or agent, without inquiry into the accuracy of such bill, statement or estimate. If at any time Agent reasonably determines that the Insurance Reserve is not or will not be sufficient to pay insurance premiums by the dates set forth above, Agent shall notify Borrower of such determination and within ten (10) days of such notice, Borrower shall make an additional deposit with respect to such insufficiency and/or increase its monthly payments to Agent by the amount that Agent estimates is sufficient to make up the deficiency at least thirty (30) days prior to the expiration of the existing insurance policies. Neither the lack of availability of funds in the Insurance Reserve nor the failure of Borrower to qualify for the release of proceeds therefrom shall release Borrower from any of its obligations under the Loan Documents, including, without limitation, the obligation to maintain all required insurance and to pay all premiums thereon as and when due.

Until expended or applied in accordance herewith, the Reserves and the funds deposited therein shall constitute additional security for the Obligations. The provisions of this Section 5(c) (together with the other related provisions of this Agreement) are intended to give Agent "control" of the Reserves and the proceeds thereof and serve as a "security agreement" and a "control agreement" with respect to the same, in each case, within the meaning of the UCC. Borrower acknowledges and agrees that the Reserves are subject to the sole dominion, control and discretion of Agent, for the benefit of Lender, its authorized agents or designees, subject to the terms hereof, and Borrower shall have no right of withdrawal with respect to any Reserve except with the prior written consent of Agent or as otherwise provided herein. The funds on deposit in the Reserves shall not constitute trust funds and may be commingled with other monies held by Agent. Borrower shall not, without obtaining the prior written consent of Agent (which consent Agent may grant or deny in Agent's sole and absolute discretion), further pledge, assign or grant any security interest in the Reserves or the sums deposited therein or permit any lien to attach thereto, or any levy to be made thereon, or any UCC-1 financing statements, except those naming Agent as the secured party, to be filed with respect thereto. Borrower hereby authorizes Agent to file a financing statement or statements under the UCC in connection with any of the Reserves in the form required to properly perfect Agent's security interest therein. Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or desirable, or that Agent may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Agent to exercise and enforce its rights and remedies hereunder with respect to any Reserve. Agent shall not be required to make any disbursement from any Reserve at any time when a breach or default by any Loan Party is continuing. The insufficiency of funds on deposit in any Reserve shall not absolve Borrower of the obligation to make any payments for which the proceeds of such Reserve are to be applied, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever. Borrower shall indemnify Agent and Lender, and hold each of Agent and Lender harmless, from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys fees and expenses) arising from or in any way connected with the Reserves, the sums deposited therein or the performance of the obligations for which the Reserves were established, except to the extent arising from an act of Agent constituting gross negligence or willful misconduct. Agent shall have the right to invest amounts on deposit in the Reserves either in Permitted Investments or by commingling such funds with the general funds of Agent and/or any Lender that is an Affiliate of Agent, as and to the extent elected by Agent, and any interest accrued thereon shall not be required to be remitted either to Borrower or to any Reserve and may instead be retained by Agent. Borrower acknowledges and agrees that it solely shall be, and shall at all times remain, liable to Agent and Lender for all fees, charges, costs and expenses in connection with the Reserves, including, without limitation, any monthly or annual fees or charges as may be assessed by any financial institution in which the Reserves are deposited and other costs incurred by Agent in connection with the administration of the Reserves.

6.    **Additional Covenants.**

[Intentionally Omitted].

7.    **Collateral Covenants.**

(a)    **Accounts.**  Borrower will notify Agent and Lender promptly of and attempt to settle, in accordance with its reasonable business judgment, all material Customer disputes, but, if Agent so elects and a Default then exists and is continuing, Agent will have the right at all times to settle, compromise, adjust, or litigate all Customer disputes directly with the Customer or other complainant upon such terms and conditions as Agent deems advisable without incurring liability to Borrower for Agent's performance of such acts (except as limited by applicable law and the indemnification provisions contained herein). Agent may, at any time and from time to time during the existence of a Default, contact Customers to verify Accounts and/or to notify Customers of Agent's security interest in the Accounts and to instruct such customers to pay such Accounts in accordance with instructions provided by Agent. All of the books and records of the Borrower and its Subsidiaries concerning Accounts and a copy of each Person's general ledger will be maintained at the address of Borrower's office set forth on **Item 16 of the Schedule.** All Accounts will be bona fide and existing obligations of Customers arising out of the sale of goods and/or the rendering of services by Borrower in the ordinary course of its business, will be owned by and owing to Borrower and will be subject to a perfected, security interest in Agent's favor, for the benefit of Lender, which security interest shall be a first priority security interest and will be free and clear of all other Liens except Permitted Liens. Upon the occurrence and during the continuance of any Default, Agent will have the right at all times to exercise any of the actions described under this **Section 7(a)** without any notice, demand, presentment or consent of any Grantor of any kind, to the extent it reasonably determines to be necessary or advisable to protect its interest hereunder or in the Collateral.

(b)    **Inventory.** All Inventory will at all times be located at one of the Inventory locations set forth on **Item 16 or 18 of the Schedule** as a current location of other Collateral, will be subject to a perfected, first-priority security interest in Agent's favor, for the benefit of Lender, and will be free and clear of all other Liens except Permitted Liens.

(c)    **Equipment.**  Borrower will maintain all Equipment used or useful in Borrower's business in working condition, ordinary wear and tear excepted, and such Equipment shall be subject to a perfected security interest in Agent's favor, for the benefit of Lender, and free and clear of all other Liens (other than Permitted Liens), at one of the locations set forth on **Item 16 or 18 of the Schedule** as a current location of other Collateral.

(d)    **Defense of Title**. All Collateral will at all times be owned by a Grantor, and each Grantor will defend its title to the Collateral against the claims of third parties in accordance with its reasonable business judgment. Each Grantor will at all times keep accurate and complete records of the Collateral.

(e)    **Perfection; Further Assurances.**    Borrower shall not change its name, state of organization, type of organization or organizational identification number without giving Agent at least ten (10) days' prior written notice thereof. Borrower will give Agent at least twenty (20) days' prior written notice of any change in the location of its principal place of business or chief executive office, any change in the locations of any Collateral to a location not previously disclosed to Agent hereunder or from time to time during the tenor of this Agreement, and any acquisition by it of any interest in real property. Borrower will, at its expense, promptly execute and deliver from time to time at Agent's request and pay the costs of filing such additional financing statements, mortgages, or other evidences of Liens as may be necessary to perfect or continue perfection of Agent's security interest in Borrower's

Collateral or, at Agent's reasonable request, to create and perfect a Lien on newly acquired real property of any Borrower.  If requested by Agent, Borrower will use commercially reasonable efforts to obtain from any landlord, warehouseman, processor or other third party operator of premises on which material Collateral is located a reasonably acceptable Lien waiver or subordination agreement in Agent's favor with respect to such Collateral.  All personal property Collateral is and will continue to be, except as expressly consented to by Agent, personal property and will not, by reason of attachment or connection to any realty, either become or be deemed to be a fixture or appurtenance to such realty and will at all times be readily removable without material damage to any realty.  In the event that any Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, Borrower shall, immediately upon written request therefor from Agent, endorse and assign such Negotiable Collateral over to Agent and deliver actual physical possession of the Negotiable Collateral to Agent.  Borrower shall at any time and from time to time use commercially reasonable efforts upon Agent's request for Agent (i) to obtain an acknowledgment, in form and substance reasonably satisfactory to Agent, of any bailee having possession of any of the Collateral (with aggregate value in excess of $100,000) that such bailee holds such Collateral for Agent, (ii) to obtain "control" of any investment property, letter-of-credit rights and chattel paper (including electronic chattel paper) in accordance with Article 9 of the UCC, with any agreements establishing control to be in form and substance satisfactory to Agent, (iii) to have Agent's Lien noted on each certificate of title evidencing any Collateral and (iv) otherwise to insure the continued perfection and priority of Agent's security interest in any of the Collateral and of the preservation of its rights therein.

(f)     **Insurance**.  Borrower shall, while any obligation of Borrower or any Guarantor under any Loan Document remains outstanding, maintain at Borrower's sole expense, with licensed insurers approved by Agent, the following policies of insurance in form and substance satisfactory to Agent:

(a)     Property Insurance.  Property insurance against loss or damage by fire, lightning, water, wind and such other perils as are included in a standard "special causes of loss form" property insurance policy in an amount no less than one hundred percent (100%) of the replacement cost (including the cost of demolition, increased costs to repair or rebuild the property to comply with current building, zoning or land use ordinance or law, and debris removal) of all real and personal property, including tenant improvements, business income or rental income insurance covering no less than twenty-four (24) months of the greater of (i) gross revenue or (ii) interest payments due under the Loan, with not less than an additional one hundred eighty (180) day period of extended indemnity coverage, and including such other endorsements as Agent may reasonably require, insuring against damage to the Property in an amount acceptable to Agent.  The policy shall contain a standard mortgagee insurance clause and Agent shall be named on the policy under a "Lender's Loss Payable Endorsement" (ISO form CP 12 18 or equivalent).

(b)     Flood and Earthquake Insurance.  Flood insurance if the Property lies within Flood Zones A or V, or if otherwise deemed necessary by Agent, and earthquake insurance in a form and with insured limits and deductibles acceptable to Agent.

(c)     Boiler and Machinery Insurance.  Boiler and machinery insurance, in an amount which is no less than twenty percent (20%) of the sum of the one hundred percent (100%) replacement cost of the Property plus the annual Gross Operating Income for the Property, covering the mechanical breakdown of boilers, air conditioning equipment and other machinery and equipment in an amount deemed necessary by Agent.

(d)     Terrorism Insurance.  The policies for property, rent loss/business interruption and liability insurance hereunder shall not exclude from coverage thereunder losses arising from acts of terrorism.

(e)     Liability Insurance.  Commercial General Liability insurance with limits no less than $1,000,000 each occurrence and $2,000,000 in the aggregate ($5,000,000 aggregate for products

liability) for any policy year with Agent included as an Additional Insured with the coverage primary and non-contributory to any other valid and collectible insurance. The use of a combination of primary and excess liability policies shall be permitted in order to maintain the required limits of liability insurance. All liability insurance policies must provide for claims to be insured on an occurrence basis. All liability policies shall include coverage of a broad form standard, including, but not limited to, explosion, collapse and underground property damage (x,c,u), completed operations, broad form contractual liability, broad form property damage and personal injury coverage.

(f)     Workers' Compensation. workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000 per accident and per disease per employee, and $1,000,000 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

(g)     General. Borrower shall provide Agent certified copies of all required insurance policies, or other evidence which is reasonably acceptable to Agent. Property insurance certificates shall be issued using the ACORD 28 form. All insurance policies shall provide that the insurance shall not be cancelable or materially changed without thirty (30) days prior written notice to Agent (10 days for non-payment of premiums). All policies, other than liability insurance policies, shall not contain any co-insurance clause or such clause shall be removed by an "agreed amount" endorsement. Agent shall be named under a Agent's Loss Payable Endorsement (ISO form CP 12 18 or equivalent) on all insurance policies which Borrower actually maintains with respect to the Property and Improvements. Borrower shall provide to Agent evidence, in a form as is reasonably required by Agent, of any other hazard insurance Agent may reasonably deem necessary at any time during the Loan. Without limitation on the foregoing, all policies shall be insured by a company or companies with a rating of "A":IX or better by A.M. Best Co. and shall contain deductibles not in excess of the lesser of (i) one percent (1%) of the policy limits and (ii) $10,000 except with respect to windstorm, which may provide for no deductible in excess of 5% of the total insurable value of the Property. If at any time Agent is not in receipt of written evidence that all insurance policies required pursuant to this Agreement are in full force and effect, Agent shall have the right, without notice to Borrower, to take such action as Agent deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Agent in its sole discretion deems appropriate. All premiums incurred by Agent in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Agent upon demand and, until paid, shall be secured by the Mortgage and shall bear interest at the Default Rate.

If at any time Agent has reason to believe that not all policies required hereunder are in full force and effect, Agent shall have the right, without notice to Borrower, to take such action as Agent deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Agent in its sole discretion deems appropriate. All premiums incurred by Agent in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Agent upon demand and, until paid, shall be secured by the Mortgage and shall bear interest at the Default Rate. Borrower shall promptly forward to Agent a copy of each written notice received by Borrower of any modification, reduction or cancellation of any of the policies or of any of the coverages afforded under any of the policies.

(g)     **Commercial Tort Claims**. If Borrower shall at any time, to its knowledge, acquire a commercial tort claim, Borrower shall immediately notify Agent in a writing signed by Borrower of the details thereof and grant to Agent in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Agent.

(h)     **Financing Statements**. Agent may at any time and from time to time file financing statements, continuation statements and amendments thereto that describe the Collateral in such manner

as the Agent may determine, and which in all such cases contain any other information required by Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether a Grantor is an organization, the type of organization and any organization identification number issued to a Grantor, and each Grantor hereby ratifies and re-authorizes all such financing statements filed by Lender or Agent on or prior to the Closing Date. Each Grantor agrees to furnish any such information to Lender promptly upon request. Any such financing statements, continuation statements or amendments may be filed by Lender without the signature of each Grantor and may be filed at any time in any jurisdiction. Each Grantor acknowledges that, until all Obligations have been paid in full, Grantor is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement naming each Grantor as the debtor and Agent or Lender as the secured party without the prior written consent of Agent or Lender, and each Grantor agrees that it shall not do so without the prior written consent of Agent or Lender.

(i)    **Post Closing Covenants**. Borrower hereby agrees that Borrower shall deliver to Agent each of the following, within the time period noted:

(i)    A land title survey of the Property, certified to Agent and its successors and assigns, and otherwise in the form of the prior survey delivered to Agent, within ten (10) Business Days after the date hereof;

(ii)    Either (x) a true, correct and complete copy of the certificate of occupancy for the Property as issued by the appropriate governmental authority, or (y) evidence reasonably satisfactory to Agent that no such certificate is required for the lawful occupancy of the Property, within thirty (30) days after the date hereof;

(iii)    A revised insurance certificate, reflecting worker's compensation insurance as required hereby but no other changes from the coverages reflected on the certificate most recently delivered to Agent, within five (5) Business Days after the date hereof; and

(iv)    A copy of the Articles of Incorporation of Borrower, certified by the Nebraska Secretary of State as being true, correct and complete, within ten (10) Business Days after the date hereof.

## 8.    **Other Covenants.**

(a)    **No Merger or Disposition of Assets**. Borrower will not, nor will it permit any Subsidiary to, merge or consolidate with any other Person, or purchase all or substantially all of the assets of any other Person, or sell, transfer, lease, abandon, or otherwise dispose of any of its interests in a Property or any substantial portion of its other assets or any of the Collateral or any interest therein.

(b)    **No Debt or Liens; Limitations on Equity**. Borrower will not obtain from any Person any loans, advances, or other financial accommodations or Indebtedness of any kind, nor will Borrower enter into any direct or indirect guaranty of any obligation of another Person, other than the Obligations hereunder. Borrower will not cause or permit any of its assets to be subject to any Lien other than Permitted Liens. Borrower will not issue any equity securities that would (A) result in a Change of Control or (B) require cash dividends or distributions or redemption at the option of the holder. Guarantor will not issue any securities that would (A) result in a Change of Control or (B) require cash dividends or distributions or redemption at the option of the holder.

(c)    **Taxes**. Borrower shall, and shall cause its Subsidiaries to, pay when due (or before the expiration of any extension period) any material tax or other assessment (including all required payments or deposits with respect to withholding taxes) except such taxes, if any, as are being contested in good

faith by appropriate proceedings and as to which adequate reserves have been established and maintained on the books and records of the Borrower and its Subsidiaries in accordance with GAAP, and Borrower will, upon request by Agent, promptly furnish Agent with proof satisfactory to Agent that it has made such payments and deposits.

(d)    **No Distributions**.  No Grantor will retire, repurchase or redeem any of its capital stock or other ownership interest in any Grantor, nor declare or pay any dividend in cash or other property (other than dividends or distributions to Borrower consisting solely of additional shares of capital stock or additional ownership interests) to any owner or direct or indirect holder of Borrower's shares or other ownership interest, except that so long as no Default is continuing hereunder, Borrower may make distributions to Guarantor so long as (i) Borrower has paid all of its current obligations, and established reasonable reserves for future liabilities, and (ii) doing so will not render Borrower insolvent.

(e)    **No ERISA Liabilities**.  Borrower will, and will cause each of its Subsidiaries to, make timely payments of all contributions required to meet the minimum funding standards for Borrower's employee benefit plans subject to the Employee Retirement Income Security Act of 1974 (as amended, "ERISA") and will promptly report to Agent the occurrence of any reportable event (as defined in ERISA) and any giving or receipt by Borrower or any Subsidiary of Borrower of any governmental notice (other than routine requests for information) in respect of any such plan.

(f)    **Transactions with Affiliates**.  Borrower will not, nor will it permit any Subsidiary to, engage in any transaction with any of its or any other Grantor's, officers, directors, employees, owners or other Affiliates, except for (i) an "arms-length" transaction on terms no less favorable to such Grantor than would be granted to such Grantor in a transaction with a Person who is not an Affiliate, and (ii) any other transactions specifically permitted hereunder or described on and under the Loan Documents.

(g)    **Loans/Investments**.  Borrower will not, nor will it permit any Subsidiary to, make or maintain any loans or advances to, or extend any credit to any Person, or purchase, acquire, own, or invest in any Person, except the Borrower may make (i) Permitted Investments; and (ii) bank deposits in the ordinary course of business.

(h)    **Amendments of Constituent Documents**.  Borrower shall not, nor shall it permit any of its Subsidiaries to, amend or modify its articles or certificate of incorporation, by-laws or other constituent documents, without the prior written consent of Agent in each case in any way, except that any Subsidiary of Borrower shall be permitted to enter into commercially reasonable modifications to its constituent documents only to the extent that could not reasonably be expected to materially adversely affect the interests of the Agent or Lender.

(i)    **Use of Proceeds**.  Notwithstanding anything contained herein to the contrary, the parties agree and acknowledge that the Loan proceeds hereunder shall be distributed by Borrower in the manner set forth on the attached **Exhibit A** (the "Funds Flow Memorandum").  Except as shown on the Funds Flow Memorandum, Borrower shall not use the proceeds of the Loan hereunder for any purpose other than to pay the fees and expenses incurred in connection with the Loan Documents and the transactions contemplated therein, to establish any reserve or cash collateral accounts required hereunder, and for working capital and other general corporate uses.

## 9.    **Reporting and Information.**

(a)    **Financial Statements**.  Borrower will submit to Lender as soon as available, and in any case not later than thirty (30) days after the end of each calendar quarter, (i) a balance sheet, and (ii) detailed statement of cash flows, in each case certified by Borrower's chief executive officer or external

accounting professional, as presenting fairly in all material respects, in accordance with GAAP, Borrower's financial condition as of the last day of such quarter. Within ninety (90) days of each calendar year end, Guarantor shall deliver to Agent a balance sheet as of the last day of such calendar year, certified by Guarantor as being true, correct and complete, together with such detail as to the assets and liabilities as Agent may reasonably request (including, without limitation, a statement describing any material adverse changes from the prior calendar year). Borrower will submit to Agent and Lender annual accountant-reviewed financial statements within one hundred twenty (120) days of the end of each fiscal year (beginning with the fiscal year ending December 31, 2014), including a balance sheet, the related statement of stockholders' equity and a statement of cash flows, together with a brief commentary thereon and analysis thereof, in each case prepared in accordance with the requirements set forth on **Item 25 of the Schedule**. Borrower will also submit to Agent and Lender, no later than December 30 of each year during the term of this Agreement, forecasted financial statements for the upcoming fiscal year, containing a projected balance sheet and profit and loss statement.

(b)    **Requested Documents and Information**. Grantors shall also provide (i) copies of any material contracts and amendments thereto, (ii) Grantors' bank statements, and (iii) any other information that may be reasonably requested by Agent for periodic review.

(c)    **Bank Accounts**. Borrower shall at all times request that the applicable account banks provide Agent with electronic "view-only" access to the Collateral Accounts.

(d)    **Other Information**. Borrower will notify Agent and Lender promptly (i) of any Default known to Borrower, (ii) upon receipt by any Grantor of written notice from any governmental authority that it intends to commence an audit or that a Grantor has or may have violated in any material respect any law, rule or regulation applicable to it or the terms or conditions of any permit or license it holds or is required to hold in connection with the conduct of its business, (iii) any amendment to its constituent documents and any change in its management or ownership, (iv) upon receipt of any default notices under any Indebtedness, (v) any material labor and employment events, and (vi) upon the commencement of any material litigation, claim or action against it. Borrower will provide to Agent and Lender such other information (including non-financial information) as Lender may from time to time reasonably request.

## 10.    Inspection Rights; Expenses; Etc.

(a)    **Inspections**. Until all Obligations shall be been paid in full, Agent shall have the right, without hindrance or delay, to inspect the Collateral, all other assets of Borrower or any portion thereof, Grantor's books and records and all other aspects of Grantor's business, and to examine and make copies of Grantor's records, the Collateral and all other assets of Grantor and its Subsidiaries or any portion thereof, in each case wherever located, and Agent may enter upon Borrower's premises for such purposes. Each Grantor will assist Agent in whatever way reasonable to make each such examination and inspection, and each Grantor agrees to pay for such examinations as more fully described on **Item 27 of the Schedule**. Agent may discuss Borrower's financial condition with Borrower's independent accountants without liability to Lender or such accountants. Agent shall have full access to all records available to Borrower from any credit reporting service, bureau or similar service and shall have the right to examine and make copies of any such records. Agent may provide a copy of this Agreement to such service and such service shall be entitled to rely on the provisions hereof in providing access to Agent as provided herein.

(b)    **Performance by Agent**. Upon and during the continuation of any Default, Agent may, in Agent's reasonable discretion, perform any agreement of Borrower hereunder which Borrower fails to perform and take any other action which Agent deems necessary for the maintenance or preservation of any of the Collateral or Agent's interest therein, and Borrower agrees to reimburse Agent promptly on

demand for all of Agent's reasonable expenses after Agent's notice thereof to Borrower in connection with the foregoing (including, without being limited to, reasonable fees and expenses of legal counsel).

**11.    Rights of Setoff, Application of Payments, Etc.**  Upon and during the continuation of a Default, Agent and Lender will be entitled to hold or set off all sums and all other property of each Grantor to such Grantor's credit or in Agent's or Lender's possession by pledge or otherwise or upon or in which Agent or Lender may have a Lien, as security for any and all of the Obligations.  Agent will have the right and is hereby irrevocably authorized and directed to charge to Borrower's account the amounts of any and all such Obligations. Recourse to the Collateral or other security for the Obligations will not at any time be required, and Borrower hereby waives, any right of marshalling Borrower may have. Borrower's obligation to pay or repay the Obligations is unconditional. Borrower agrees that Agent may take such action with regard to the custody and collection of Accounts assigned to Agent as Agent may reasonably deem necessary to protect its rights hereunder.  Borrower agrees that failure to take any action with regard to any given Account will not be unreasonable until and unless Agent receives a written request for specific action from Borrower with regard thereto and fails to respond thereto within a commercially reasonable time.  Borrower irrevocably waives the right to direct the application of any and all payments and collections at any time or times hereafter received by Agent from or on behalf of Borrower, and Borrower hereby irrevocably agree that Agent shall have the continuing exclusive right to apply and reapply any and all such payments and collections received at any time or times hereafter by Agent or its agent against the Obligations, in such manner and in such order as Agent may deem advisable.

**12.    Attorney-in-Fact.**  Borrower hereby appoints and constitutes Agent as Borrower's attorney-in-fact to take the following actions upon the occurrence and during the existence of any Default to the extent the Agent reasonably deems it necessary to protect its rights hereunder: (i) to send verifications of Accounts to Customers: (ii) to endorse Borrower's name upon any notes, acceptances, checks, drafts, money orders, and other evidences of payment that come into Agent's or Lender's possession and to deposit or otherwise collect the same; and (iii) to execute in Borrower's name any financing statements, affidavits and notices with regard to any and all Lien rights; (iv) to notify the postal authorities to change the address and delivery of mail addressed to Borrower to such address as Agent may designate; (v) to sign Borrower's name on any invoice or bill of lading relating to the Collateral, on drafts against Customers, and notices to Customers; (vi) to sign any agreement or certificate in connection with any insurance policy of Borrower (including any documentation to receive benefit payments due thereunder or to cancel such insurance policy and receive a refund of the unearned premium with respect thereto); and (vii) to do all other acts and things necessary to carry out this Agreement.  All acts of said attorney-in-fact are hereby authorized, ratified and approved, and said attorney-in-fact will not be liable for any errors or mistake of fact or law.  This power, being coupled with an interest, is irrevocable while any of the Obligations remain unpaid or Lender has any commitment to Borrower under this Agreement.

**13.    Defaults and Remedies.**

(a)    **Defaults.**  For purposes of this Agreement, "Default" means the occurrence of any of the following events:

(i)    non-payment when due of any amount payable on any of the Obligations, and such non-payment continues for a period of five (5) days;

(ii)    breach of or failure to perform by any Grantor of any of the applicable financial covenants under **Section 6**;

(iii)    breach of any covenant or failure to perform any agreement or failure to meet any of a Grantor's contained in **Section 8** of this Agreement, provided, that if such breach or failure is curable, no Default shall be deemed to result therefrom unless such breach or failure continues for five (5) days following the date of such breach or failure;

(iv)    breach of any covenant or failure to perform any agreement or failure to meet any of Borrower's or any other Loan Party's obligations contained herein (other than as described in clauses (i), (ii) and (iii) above), in any other Loan Document or in any other agreement out of which any of the Obligations arose; provided, that if such breach or failure is curable, no Default shall be deemed to result therefrom unless such breach or failure continues for thirty (30) days following the date of such breach or failure;

(v)    any statement, representation, or warranty made in writing in this Agreement, any other Loan Document or in any other writing or statement at any time furnished or made or deemed furnished or made by Borrower or any other Loan Party to Agent or Lender proves to have been untrue in any material respect as of the date furnished or made or deemed furnished or made;

(vi)    a Grantor's or any of its Subsidiary's default under any agreement relating to Indebtedness for borrowed money or any other agreement involving more than the amount set forth on **Item 28 of the Schedule**;

(vii)    suspension of the operation of a Grantor's or any Subsidiary's present business solely to the extent such suspension directly results in a Material Adverse Effect;

(viii)    any Loan Party or any Subsidiary of any Loan Party becomes insolvent or unable to pay its debts as they mature, or admits in writing that it is insolvent or unable to pay its debts, makes an assignment for the benefit of creditors (other than Agent or Lender), makes a conveyance fraudulent as to creditors under any state or federal law, or a proceeding is instituted by or against any Loan Party or any Subsidiary of any Loan Party alleging that such Loan Party or such Subsidiary is insolvent or unable to pay debts as they mature, or a petition under any provision of Title 11 of the United States Code, as amended, is filed by or against any Loan Party or any Subsidiary of any Loan Party and is not dismissed or stayed within thirty (30) days;

(ix)    entry of any judgment by a court of competent jurisdiction in excess of the amount set forth on **Item 29 of the Schedule** against any Loan Party or creation, assertion, or filing of any judgment Lien or tax Lien against the property of any Loan Party in excess of such amount, which in the case of any such judgment remains undischarged or unstayed for thirty (30) days after such entry or filing;

(x)    any Change of Control;

(xi)    termination, unenforceability or withdrawal of any guaranty or indemnity provided by Guarantor, or failure of Guarantor to perform any of its obligations under such guaranty or indemnity, or assertion by Guarantor that it has no liability or obligation under such guaranty or indemnity;

(xii)    appointment of a receiver for the Collateral or for any other material property in which any Grantor has an interest;

(xiii)   seizure of any portion of the Collateral having a value greater than $100,000 by any Person other than Lender;

(xiv)   the occurrence of any act, omission, event or circumstance which has or could reasonably be expected to have a Material Adverse Effect (taking into account, together with all relevant considerations, any insurance coverage that has been acknowledged by the insurer);

(xv)   the Pension Benefit Guaranty Corporation or the Department of Labor commences proceedings under ERISA to terminate any Borrower's employee pension benefit plans.

(b)   **Remedies**.  If a Default occurs and is continuing, in each case without prior notice to Borrower, any other Loan Party or any other Person (unless such notice is expressly required hereunder or under applicable law):

(i)   Lender may terminate its commitment, if any, to make the Loan or to extend other financial accommodations to Borrower, and may declare the entire principal amount of the Loan outstanding hereunder, all interest thereon, any unpaid fees and all other Obligations of any kind or nature to be, and thereupon the same will immediately become, due and payable in full; and, in the event of a Default described under clause (viii) of **Section 13(a)**, such termination and acceleration shall automatically occur without any notice, demand or presentment of any kind.

(ii)   Agent or Agent's designee may notify Customers that the Accounts have been assigned to Agent and that Agent has a security interest therein, collect them directly, and charge the collection costs and expenses to Borrower's loan account.

(iii)   Agent may, and at the direction of the Lender shall (A) exercise any of its remedies under any other Loan Document, (B) apply any cash collateral to the Obligations (without limiting the foregoing, Agent may instruct any bank or other financial institution holding any cash, certificate of deposit or other Collateral to pay over such Collateral to Agent), and (C) draw on any letter of credit issued for the benefit of Agent in connection with this Agreement or any other Loan Document and apply the proceeds thereof to the Obligations.

(iv)   Agent may make such payments and do such acts as Agent considers necessary or reasonable to protect its security interest in the Collateral.  Borrower authorizes Agent to enter each premises where any Collateral is located, take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest or compromise any Lien which in Agent's opinion appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith.

(v)   Agent may ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale and sell the Collateral.  Any such sale may be either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms.  It is not necessary that the Collateral be present at any such sale.

(vi)   Agent may, without regard to any waste, adequacy of the security or solvency of Borrower, apply for the appointment of a receiver of the Collateral, to which appointment Borrower hereby consents, whether or not foreclosure or repossession proceedings have been commenced hereunder or under any other Loan Document and whether or not a foreclosure sale or secured party sale has occurred.

(vii)    Agent may cancel any insurance policy of Borrower, in exchange for a refund of the unearned premium with respect thereto, and Borrower hereby authorizes any insurance company which has issued any such policy to make such payment directly to Agent for application to the Obligations.

(viii)    Agent may, and at the direction of the Lender, shall, exercise any of the remedies available to Agent as a secured party under the Uniform Commercial Code as in effect in any applicable jurisdiction, or otherwise available to Agent under applicable law.  Borrower agrees, upon Default and written notice thereof by Agent, to cease the sale or other disposition of the Collateral, except with Agent's prior written consent, and to assemble at Borrower's expense all the Collateral at a convenient place acceptable to Agent.  Agent may charge to Borrower's loan account and Borrower will pay Agent upon demand all costs and expenses, including reasonable attorneys' fees (including fees of attorneys that are regular salaried employees of Agent or any of its Affiliates), in connection with: (A) the liquidation of any Collateral; (B) obtaining or enforcing payment of the Obligations; (C) the settlement, adjustment, compromise, or litigation of Customer disputes; or (D) the prosecution or defense of any action or proceeding either against Agent or Lender or against Borrower, concerning any matter growing out of or in connection with this Agreement and/or any Collateral and/or any Obligations.  If at any time Agent pays any state, city, local, federal, or other tax or levy attributable to the Collateral, Borrower will repay to Agent the amount of tax so paid by Agent.  Borrower agrees that Agent may apply any proceeds from disposition of the Collateral first to satisfy obligations secured by Liens prior to Agent's security interest.  Borrower will remain liable and will pay on demand any deficiencies arising upon the liquidation of any Collateral held by Agent.

(ix)    Agent may exercise such other rights and remedies as may then be available to Agent or Lender, whether pursuant to this Agreement, any other Loan Document, at law, in equity or otherwise.

(c)    **Notices**.  If any notice of intended disposition of the Collateral or of any other act by Lender is required by law and a specific time period is not stated therein, such notice, if given ten (10) days before such disposition or act, in accordance with the provisions of **Section 15(a)**, will be deemed reasonably and properly given.

(d)    **License**.  Each Grantor grants to Agent a license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral, or otherwise exercising any remedies available to it under this Agreement and the other Loan Documents.

(e)    **Remedies Cumulative**.  Agent's and Lender's rights and remedies under this Agreement and all other Loan Documents shall be cumulative.  Agent and Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity.  No exercise by Agent or Lender of one right or remedy shall be deemed an election, and no waiver by Agent or Lender of any default on Borrower's part shall be deemed a continuing waiver.  No delay by Agent or Lender shall constitute a waiver, election or acquiescence by it.

14.    **Indemnification.**

(a)    **General Indemnification**.  Grantors, jointly and severally, shall each, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each Indemnified Person from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings,

obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including, but not limited, to reasonable attorneys' fees and other costs of defense) (collectively, the "**Losses**") imposed upon or incurred by or asserted against any Indemnified Person and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) ownership of the Loan and/or the Loan Documents, the Property, or receipt of any rents from the Property (or any interest in any of the foregoing); (b) any amendment to, or restructuring of, the Obligation, the Note, this Agreement or any other Loan Documents, by operation of any law (including, without limitation, any Creditors' Rights Law); (c) any and all lawful action that may be taken by Agent or Lender in connection with the enforcement of the provisions of this Agreement, the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Grantor and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to, or death of, persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (f) any failure on the part of Grantor to perform or be in compliance with any of the terms of this Agreement or any of the other Loan Documents; (g) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (h) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with the Mortgage, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which the Mortgage is made; (i) any failure of the Property to be in compliance with any Legal Requirements; (j) the enforcement by any Indemnified Person of the provisions of this Section 14; (k) any and all claims and demands whatsoever which may be asserted against Agent or Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (l) the payment of any commission, charge or brokerage fee to anyone claiming through Grantor which may be payable in connection with the funding of the Loan; or (m) any misrepresentation made by Grantor in this Agreement or any other Loan Document. Any amounts payable by reason of the application of this Section 14 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by the Indemnified Person until paid.

(b)    **Mortgage and Intangible Tax Indemnification**. Grantors, jointly and severally, shall each, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each Indemnified Person from and against any and all Losses imposed upon or incurred by or asserted against such Indemnified Person and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of the Mortgage, the Note or any of the other Loan Documents.

(c)    **ERISA Indemnification**. Grantors, jointly and severally, shall each, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each Indemnified Person from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Agent's sole discretion) that such Indemnified Person may incur, directly or indirectly, as a result of any violation of (or prohibited transaction under) ERISA.

(d)    **Duty to Defend, Legal Fees and Other Fees and Expenses**. Upon written request by an Indemnified Person, Grantors, jointly and severally, shall defend such Indemnified Person (if requested, in the name of the Indemnified Person) by attorneys and other professionals approved by the

Indemnified Person.   Notwithstanding the foregoing, any Indemnified Person may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of such Indemnified Person, their attorneys shall control the resolution of any claim or proceeding. Upon demand, Grantors, jointly and severally, shall pay or, in the sole discretion of the Indemnified Person, reimburse, the Indemnified Person for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

(e)     **Brokers**.  Grantors, jointly and severally, each hereby represents that it has dealt with no financial advisors, brokers, investment bankers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement, except for a broker whose commission is being paid in full as set forth on the Funds Flow Memorandum.  Grantors, jointly and severally, each hereby agrees to indemnify, defend and hold each Indemnified Person harmless from and against any and all claims, liabilities, costs and expenses of any kind (including attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower, Guarantor, Agent or Lender in connection with the transactions contemplated herein.

(f)     **Survival**.   The indemnifications made pursuant to this Section 14 shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by any of the following:  any satisfaction or other termination of the Mortgage, any assignment or other transfer of all or any portion of the Mortgage or Lender's interest in the Property (but, in such case, shall benefit both Indemnified Parties and any assignee or transferee), any exercise of Lender's rights and remedies pursuant hereto including, but not limited to, foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to this Agreement, the Note or any of the other Loan Documents, any transfer of all or any portion of the Property (whether by Borrower or by Lender following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), any amendment to this Agreement, the Note or the other Loan Documents, and any act or omission that might otherwise be construed as a release or discharge of Borrower from the obligations pursuant hereto.

## 15.     **Guaranty; Joint and Several Obligations of Borrower.**

(a)     **Guaranty of the Obligations.**  Subject to the provisions of Section 15(k) below, Guarantor hereby irrevocably and unconditionally guaranties to Agent, for the benefit of Lender, the due and punctual payment in full of all Obligations of the Borrower when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "Guaranteed Obligations").

(b)     **Payment by Guarantor.**  Guarantor agrees, in furtherance of the foregoing and not in limitation of any other right which any Agent or Lender may have at law or in equity against any Loan Party by virtue hereof, that upon the failure of Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantor will upon demand pay, or cause to be paid, in cash, to Agent for the ratable benefit of Lender, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Agent and Lender as aforesaid.

(c)    **Joint and Several Liability**.  If there shall be more than one Borrower party hereto from time to time, all such Persons shall be jointly and severally liable for the payment and performance of all Guaranteed Obligations hereunder, regardless of which Person received the proceeds of the Term Loan or any other financial accommodation under this Agreement.  Such joint and several liability shall apply to all Guaranteed Obligations, regardless of whether such Guaranteed Obligations are specifically designated as being the joint and several obligation of such Persons in any other provision of this Agreement or any other Loan Document.

(d)    **Liability of Co-Obligors Absolute.**  Borrower and Guarantor (for purposes of this **Section 15**, Borrower and Guarantor are sometimes referred to individually as a "Co-Obligor" and collectively as the "Co-Obligors") agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Co-Obligor agrees as follows:

(i)    this **Section 15** constitutes a guaranty of payment when due and not of collectability.  The obligations of each Co-Obligor under this **Section 15** are primary obligations of each such Co-Obligor and not merely a contract of surety;

(ii)    Agent may enforce this **Section 15** upon the occurrence and during the continuation of a Default notwithstanding the existence of any dispute between a Borrower and any Agent or Lender with respect to the existence of such Default;

(iii)    the obligations of each Co-Obligor hereunder are independent of the obligations of each other Loan Party (including any other Loan Party, as Borrower or otherwise), of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against each Co-Obligor whether or not any action is brought against Borrower or any of such other Loan Parties and whether or not Borrower is joined in any such action or actions;

(iv)    payment by each Co-Obligor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge each Co-Obligor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if Agent is awarded a judgment in any suit brought to enforce each Co-Obligor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Co-Obligor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by each Co-Obligor, limit, affect, modify or abridge any other Co-Obligor's liability hereunder in respect of the Guaranteed Obligations;

(v)    Agent or Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of each Co-Obligor's liability hereunder, from time to time may (1) renew, extend, accelerate, increase the rate of interest on, subject to the terms of this Agreement or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (2) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (3) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof of the Guaranteed Obligations; (4) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person

(including any other Co-Obligor) with respect to the Guaranteed Obligations; (5) enforce and apply any security now or hereafter held by or for the benefit of Agent or Lender in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that Agent or Lender may have against any such security, in each case as Agent or Lender in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of each Co-Obligor against Borrower or any security for the Guaranteed Obligations; and (6) exercise any other rights available to it under the Loan Documents; and

(vi)    This **Section 15**, and the obligations of each Co-Obligor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not each Co-Obligor shall have had notice or knowledge of any of them: (1) any failure or omission to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (2) any amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document, or any agreement relating to such other guaranty or security; (3) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (4) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for Indebtedness other than the Guaranteed Obligations) to the payment of Indebtedness other than the Guaranteed Obligations, even though Agent or Lender might have elected to apply such payment to any part or all of the Guaranteed Obligations; (5) Agent or Lender's consent to the change, reorganization or termination of the corporate structure or existence of Borrower or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (6) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (7) any defenses, set-offs or counterclaims which Borrower may allege or assert against Agent or Lender in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, performance, statute of frauds, statute of limitations, accord and satisfaction and usury, and (8) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of each Co-Obligor as an Loan Party in respect of the Guaranteed Obligations.

(e)    **Waivers by Each Co-Obligor.**  Each Co-Obligor hereby waives, for the benefit of Agent and Lender: (i) any right to require Agent or Lender, as a condition of payment or performance by each Co-Obligor, to (1) proceed against Borrower, any other Loan Party or any other Person, (2) proceed against or exhaust any security held from Borrower, any such other Co-Obligor or any other Person, (3) proceed against or have resort to any balance of any Deposit Account or credit on the books of Agent or Lender in favor of Borrower or any other Person, or (4) pursue any other remedy in the power of Agent or Lender whatsoever; (ii) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower or any other Loan Party including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrower or any other Loan Party from any cause other than payment in full of the Guaranteed Obligations; (iii) any defense based

{00892255;5}                          31

upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (iv) any defense based upon Agent or Lender's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith, gross negligence or willful misconduct; (v) (1) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of each Co-Obligor's obligations hereunder, (2) the benefit of any statute of limitations affecting each Co-Obligor's liability hereunder or the enforcement hereof, (3) any rights to set-offs, recoupments and counterclaims, and (4) promptness, diligence and any requirement that Agent or Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (vi) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrower and notices of any of the matters referred to in clause (d) and any right to consent to any thereof; and (vii) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate each Co-Obligor or sureties, or which may conflict with the terms hereof. Furthermore, and without limiting the foregoing, any tender of repayment of the Obligations shall be deemed to constitute Grantors' certification that it has no claim, demand or offset as against Agent and each Lender, except to the extent written notice thereof is given prior to tender of such repayment.

(f)     **Co-Obligor's Rights of Subrogation, Contribution, etc.**     Until the Guaranteed Obligations shall have been indefeasibly paid in full and this Agreement shall have terminated, each Co-Obligor hereby waives, any claim, right or remedy, direct or indirect, that each Co-Obligor now has or may hereafter have against Borrower or any other Loan Party or any of its assets in connection with the terms of this **Section 15** or the performance by each Co-Obligor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (i) any right of subrogation, reimbursement or indemnification that each Co-Obligor now has or may hereafter have against Borrower with respect to the Guaranteed Obligations, (ii) any right to enforce, or to participate in, any claim, right or remedy that Agent or Lender now has or may hereafter have against Borrower, and (iii) any benefit of, and any right to participate in, any collateral or security now or hereafter held by Agent or Lender. In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and this Agreement shall have terminated, each Co-Obligor shall withhold exercise of any right of contribution each Co-Obligor may have against any other Loan Party (including any other Co-Obligor) of the Guaranteed Obligations, including, without limitation, any such right of contribution as contemplated by clause (b) of this **Section 15.** Each Co-Obligor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification each Co-Obligor may have against Borrower or against any collateral or security, and any rights of contribution each Co-Obligor may have against any such other Loan Party, shall be junior and subordinate to any rights Agent or Lender may have against such Loan Party, to all right, title and interest Agent or Lender may have in any such collateral or security, and to any right Agent or Lender may have against such other Loan Party. If any amount shall be paid to a Co-Obligor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Agent on behalf of Lender and shall forthwith be paid over to Agent for the benefit of Lender to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

(g)     **Subordination of Other Obligations.**     Any Indebtedness of Borrower or any Loan Party now or hereafter held by each Co-Obligor (the "Obligee Grantor") is hereby subordinated in right

of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Grantor after a Default has occurred and is continuing shall be held in trust for Agent on behalf of Lender and shall forthwith be paid over to Agent for the benefit of Lender to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Grantor under any other provision hereof.

(h)    **Continuing Guaranty.**  This **Section 15** is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full and this Agreement shall have terminated.  Each Co-Obligor hereby irrevocably waives, any right to revoke this **Section 15** as to future transactions giving rise to any Guaranteed Obligations.

(i)    **Financial Condition of Borrower.**  Any Loan or other financial accommodation may be made to Borrower from time to time without notice to or authorization from any Co-Obligor regardless of the financial or other condition of Borrower at the time of any such grant. Neither Agent nor Lender shall have any obligation to disclose or discuss with any Co-Obligor its assessment, or such Co-Obligor's assessment, of the financial condition of Borrower. Each Co-Obligor has adequate means to obtain information from Borrower on a continuing basis concerning the financial condition of Borrower and its ability to perform its obligations under the Loan Documents, and each Co-Obligor assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Co-Obligor hereby waives and relinquishes, solely to the extent permitted by applicable law, any duty on the part of Agent or Lender to disclose any matter, fact or thing relating to the business, operations or conditions of Borrower now known or hereafter known by Agent or Lender.

(j)    **Bankruptcy, etc.**  So long as any Guaranteed Obligations remain outstanding, each Co-Obligor shall not, without the prior written consent of Agent acting pursuant to the instructions of Lender, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against Borrower or any other Loan Party. The obligations of each Co-Obligor hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any other Loan Party or by any defense which Borrower or any other Loan Party may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

Each Co-Obligor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (i) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of each Co-Obligor, Agent and the Lender that the Guaranteed Obligations which are guaranteed by each Co-Obligor pursuant hereto should be determined without regard to any rule of law or order which may relieve Borrower of any portion of such Guaranteed Obligations. Each Co-Obligor will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Agent, or allow the claim of Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

In the event that all or any portion of the Guaranteed Obligations are paid by Borrower, the obligations of each Co-Obligor hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from Agent or Lender as a preference, fraudulent transfer or otherwise,

and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

(k)   **EXCULPATION OF GUARANTOR.**   Notwithstanding the foregoing provisions of this Section 15, the liability of Guarantor shall be limited as follows:

(1)   Guarantor shall be and remain fully and personally liable to Agent and Lender for the full amount of the Obligations in the event of any of the following:  (A) the occurrence of a Bankruptcy Recourse Event; or (B) the granting of any Lien on any Collateral, or any portion of thereof (including, without limitation, the Property), except as expressly permitted by this Agreement; or (C) the Sale or Pledge of any interest in Borrower or any Loan Party, or in any Subsidiary thereof, in each case except as expressly permitted by this Agreement; and

(2)   Guarantor shall be liable to Agent and Lender only for the amount of any and all loss, damage, cost, expense, liability, claim or other obligation incurred by Agent or Lender (including attorneys' fees and costs reasonably incurred by Agent and Lender in connection with exercising its rights and remedies) arising out of or in connection with the following:

(i)   fraud, willful misrepresentation, or willful failure to disclose a material fact, in each case, by (or at the direction of) any Loan Party; or

(ii)   conversion, misapplication or misappropriation of rents, security deposits, condemnation awards or insurance payments by (or at the direction of) any Loan Party; or

(iii)   gross negligence or willful misconduct of (or at the direction of) any Loan Party; or

(iv)   material physical waste to any Collateral (including, without limitation, the Property) by or at the direction of any Loan Party, or damage thereto caused by the intentional acts or intentional omissions of any Loan Party, and/or (during the continuance of an Event of Default) the removal or disposal of any portion of the Collateral; or

(v)   failure to pay taxes or other amounts (including, without limitation, charges for labor or materials) that (if not paid) would constitute a Lien against any Collateral senior to the interest of Agent or Lender in such Collateral; or

(vi)   failure to maintain the insurance coverages required hereunder, or to provide Agent evidence of the same as provided herein; or

(vii)   any litigation or other legal proceeding related to the Obligations filed by, or any other act or omission by, any Loan Party that delays, opposes, impedes, obstructs, hinders, enjoins or otherwise interferes with or frustrates the efforts of Agent or Lender to exercise any rights and remedies available to either of them or to realize on any Collateral, including, without limitation, the assertion by any Loan Party of any defenses (other than defenses raised in good faith) or counterclaims against Agent or Lender; or

(viii)   seizure or forfeiture of the Collateral, or any portion thereof, or any Loan Party's interest therein, resulting from criminal wrongdoing by any Loan Party.

The provisions of this Section 15(k) shall not, however, (1) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (2) impair the right of Agent to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage or in any

other action to realize upon any Collateral; (3) affect the validity or enforceability of the Environmental Indemnity) or any of the rights and remedies of Agent or Lender thereunder (including, without limitation, Agent's right to enforce said rights and remedies against Guarantor without the effect of the exculpatory provisions of this Section 15(k)); (4) impair the right of Agent to obtain the appointment of a receiver; (5) impair the enforcement of the assignment of leases set forth in the Loan Documents; or (6) constitute a prohibition against Agent to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Mortgage or to commence any other appropriate action or proceeding in order for Agent to exercise its remedies against any Collateral (including, without limitation, the Property). Further, the provisions of this Section 15(k) shall in no event constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise. Furthermore, notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, neither Agent nor Lender shall be deemed to have waived any right which Agent or Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the debt owed hereunder or to require that all Collateral shall continue to secure all of the debt owing to Agent and Lender in accordance with the Loan Documents.

16.    **General Provisions.**

(a)    **Notices**. Except as specifically provided in this Agreement or in any of the other Loan Documents, all notices and communications hereunder and thereunder will be in writing. Notices in writing will be delivered personally or sent by overnight courier service, by certified or registered mail, postage pre-paid, or by facsimile transmission and will be deemed received, in the case of personal delivery, when delivered (or upon refusal of delivery); in the case of overnight courier service, on the next Business Day after delivery to such service; in the case of mailing, on the fourth Business Day after mailing; and, in the case of facsimile transmission, upon transmittal if confirmed by the sender's facsimile device; provided, however, that in the case of notices to Agent or Lender, Agent or Lender will be charged with knowledge of the contents thereof only when such notice is actually received by Agent or Lender. Notices to any party hereto will be sent to the addresses set forth on **Item 31 of the Schedule**, or any other address for address of such party of which the other is notified by like notice.

(b)    **No Waiver**. No waiver hereunder will be valid unless in writing signed by Agent and Lender and then only to the extent therein stated. No delay or failure on Agent's and Lender's part in the exercise of any right or remedy hereunder will operate as a waiver thereof or of Lender's right to exercise any other right or remedy.

(c)    **Reserved**.

(d)    **Severability**. Wherever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement will be prohibited by or invalid under applicable law, such provision will be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(e)    **Successors and Assigns**. Grantor's, Agent's and Lender's rights and obligations hereunder and under the other Loan Documents will inure to the benefit of Grantor's, Agent's and Lender's respective successors and assigns; provided, however, that Borrower and Guarantor each acknowledges and agrees that without Agent's prior written consent, which may be withheld for any reason or no reason, neither Borrower nor Guarantor may assign its rights or obligations or any part thereof hereunder or under any other Loan Document to any other Person. Notwithstanding anything herein to the contrary, Agent and Lender may, without the consent of Borrower or any other Loan Party, grant a security interest in, sell or assign, grant or sell participations or otherwise transfer all or any

portion of its rights and obligations hereunder and/or under one or more other Loan Documents to one or more other Persons.

(f)      **Governing Law; Submission to Jurisdiction; Service; Etc.**

(1)      THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS WAS NEGOTIATED IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, *EXCEPT THAT* AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS IN REAL PROPERTY, IMPROVEMENTS AND FIXTURES CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH SUCH REAL PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH GRANTOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(2)      ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY PARTY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT AGENT'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE COUNTY AND STATE OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND EACH GRANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH GRANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  EACH GRANTOR DOES HEREBY DESIGNATE AND APPOINT:

ANIL DANG
345 SOUTH END AVENUE, #6K
NEW YORK, NEW YORK 10280

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF

SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GRANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON SUCH GRANTOR IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GRANTOR (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(g)    **Waiver of Jury Trial**. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH GRANTOR, AGENT AND LENDER EACH HEREBY IRREVOCABLY AND EXPRESSLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, THE OBLIGATIONS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR ANY PARTY'S ACTIONS IN ITS NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT HEREOF OR THEREOF. EACH GRANTOR, AGENT AND LENDER EACH ACKNOWLEDGES THAT SUCH WAIVER IS MADE WITH FULL KNOWLEDGE AND UNDERSTANDING OF THE NATURE OF THE RIGHTS AND BENEFITS WAIVED HEREBY, AND WITH THE BENEFIT OF ADVICE OF COUNSEL OF ITS CHOOSING.

(h)    **Expenses**. Borrower shall pay on demand all of Agent's and Lender's costs and expenses in connection with underwriting and performing due diligence with respect to the transactions contemplated hereby and the preparation, reproduction, execution, delivery, administration and enforcement of this Agreement, including the reasonable fees and out-of-pocket expenses of Agent's counsel, in each case whether incurred on, prior or subsequent to the Closing Date. In addition, Borrower shall pay any and all stamp and other taxes and recording and filing fees payable in connection with the execution and delivery of all other instruments and documents to be delivered hereunder. Such amounts may be charged by Agent to Borrower's account. All provisions in this Agreement providing for the payment or reimbursement of Agent's and Lender's attorneys' fees and expenses shall be payable regardless of whether or not such attorney is a regularly salaried employee of Agent or any Affiliate of Agent and shall include, without limitation, such fees and expenses incurred pursuant to or in connection with proceedings brought under 11 U.S.C., the Federal Bankruptcy Code.

(i)    **Limitation of Liability for Certain Damages**. In no event shall Agent, Lender or their respective Affiliates or any of their respective officers, directors, employees or agents be liable on any theory of liability for any special, indirect, consequential, exemplary or punitive damages (including any such that are loss of profits, business or anticipated savings) in connection with this Agreement or any of the transactions contemplated hereby. Borrower hereby waives, release and agrees not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(j)    **Execution in Counterparts; Execution by Fax or E-Mail; Waiver of Acceptance**. This Agreement may be executed in separate counterparts, all of which shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement or any other Loan Document by

facsimile or e-mail shall be equally as effective as delivery of an original executed counterpart of this Agreement or such other Loan Document. Any party delivering an executed counterpart of this Agreement or any other Loan Document by facsimile or e-mail also shall deliver an original executed counterpart of this Agreement or such other Loan Document, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement or such other Loan Document. To the fullest extent permitted by applicable law, Borrower waives notice of Agent's acceptance of this Agreement and the other Loan Documents.

    (k)    **No Third-Party Beneficiaries**. Neither (i) any stockholder or owner of any other equity interest in any Grantor, (ii) any Grantor's employees or creditors (other than Lender and Lender's Affiliates), nor (iii) any other Person claiming by or through any Grantor shall be entitled to rely on this Agreement or have any rights, remedies or claims against Agent, Lender or any Affiliate of Agent or Lender under or in connection with this Agreement.

    (l)    **Entire Agreement**. This Agreement and the other Loan Documents embody the entire agreement and understanding among Agent, Lender and Borrower relating to the subject matters hereof and supersede all prior agreements and understandings relating to such subject matters.

    (m)    **Publication**. Except to the extent consented to by Agent in writing, Grantor shall not use or disclose information with respect to Agent or Lender, or the existence of this Agreement or the transactions contemplated herein, except to the extent required by law.

    (n)    **Amendments to Loan Documents**. No amendment or modification of any Loan Document, and no consent to or waiver of any Default, or consent to or waiver of the application of any covenant or representation set forth in any of the Loan Documents, or any other document or agreement described in or related to this Agreement, or any release of Agent's Lien on any Collateral, shall be effective unless it has been agreed to by Agent, Lender, and the applicable Loan Party or Loan Parties party to such Loan Document in a written agreement that: (i) specifically states that it is intended to amend or modify specific Loan Documents, or any other document or agreement described in or related to this Agreement, or waive any Default or the application of any covenant or representation of any terms of specific Loan Documents, or is intended to release Agent's Lien on specific Collateral; and (ii) is signed by an authorized officer of all parties, or by an authorized officer of a Lender with respect to a consent or waiver. The terms of an amendment, consent or waiver memorialized in any written agreement shall be effective only to the extent, and in the specific instance, and for the limited purpose to which Agent, Lender and Borrower have agree.

    (o)    **Confidentiality**. The Agent and the Lender agree to use reasonable efforts to maintain the confidential nature of, and shall not use or disclose the Loan Parties or any of their Affiliates' financial information or other information that the Agent or the Lender are provided pursuant to the terms of the Loan Documents or during the course of their due diligence (collectively, the "Confidential Information") without first obtaining the Loan Party's or such Affiliate's prior written consent; provided that nothing in this Section 16(o) shall require the Agent or Lender to obtain any consent of any Person in connection with (and the Grantors hereby authorizes the Agent and the Lender to freely disclose any Confidential Information without any consent of the Loan Parties or their Affiliates, to the extent otherwise required, in connection with) (a) exercising any of their respective rights under the Loan Documents, including those exercisable upon the occurrence of an Event of Default; (b) any situation in which the Agent or the Lender is required by law or requested or required by any Governmental Authority, or stock exchange or other self-regulatory organization purporting to have jurisdiction over a party hereto to disclose the information (if such Person uses reasonable efforts to maintain confidentiality of the information disclosed); (c) any situation in which the Agent or the Lender is requested or required to disclose such Confidential Information pursuant to any subpoena or similar legal process; (d) providing

information to counsel to the Agent or Lender in connection with the transactions contemplated by any of the Loan Documents (if such Lender informs such counsel of the confidential nature of such information and requires that it be kept confidential on the terms substantially similar to this Section 16(o) prior to disclosure of such information); (e) providing information to independent auditors retained by the Agent or Lender (if the Agent or Lender informs such auditors or consultants of the confidential nature of such information and requires that it be kept confidential on the terms substantially similar to this Section 16(o)); (f) providing information to expert consultants retained by the Agent or the Lender (if such consultant agrees to be bound by the terms of a confidentiality agreement substantially similar to this Section 16(o) prior to the disclosure of such information); (g) any information that is in or becomes part of the public domain otherwise than through a wrongful act of the Agent or Lender seeking such disclosure or any employees or the agents thereof or those of its Affiliates; (h) any information that is in the lawful possession of the Agent or Lender prior to receipt thereof from the Loan Parties or their Affiliates or any other Person known to the Agent or the Lender to be acting on behalf of such Person as evidenced by contemporaneous written or electronic records of the Lender or the Agent seeking disclosure and that was not acquired, directly or indirectly, from the Loan Party or Affiliate or any other Person acting on its behalf, provided, that such information is not subject to another confidentiality agreement or other obligation of secrecy; (i) any information that is developed by the Agent or Lender independently of and without reference to the Confidential Information; and (j) any information that is lawfully disclosed to the Agent or Lender by a third party that has no obligation of confidentiality with respect to the information disclosed.

17.   **Agent.**

(a)   **Appointment**. Lender hereby designates and appoints Full Circle Capital Corporation as its "Agent" under this Agreement and the Loan Documents, and Lender hereby irrevocably authorizes Agent to take such action or to refrain from taking such action on its behalf under the provisions of this Agreement and the Loan Documents and to exercise such powers as are set forth herein or therein, together with such other powers as are reasonably incidental thereto. Agent is authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other Loan Documents on behalf of Lender. The provisions of this **Section 17** are solely for the benefit of Agent and Lender and neither Grantor nor any of its Affiliates shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement, Agent shall act solely as an administrative representative of Lender and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for Lender, Borrower or any Loan Party; without limiting the foregoing, Agent shall have no duty or obligation to make any advances required to be made by Lender hereunder. Agent may perform any of its duties hereunder, or under the Loan Documents, by or through its agents or employees.

(b)   **Reliance**. Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message or other communication (including any writing, telecopy or email) believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it. Agent shall be entitled to rely upon the advice of legal counsel, independent accountants, and other experts selected by Agent in its sole discretion.

(c)   **Agent Individually**. With respect to any portion of the Loan made by it, Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender. The terms "Lender" or any similar terms shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a

Lender. Agent may lend money to, and generally engage in any kind of banking, trust or other business with any Loan Party as if it were not acting as Agent pursuant hereto.

(d)     **Successor Agent**.

(i)     **Resignation**. Agent may resign from the performance of all its functions and duties hereunder at any time by giving at least thirty (30) Business Days' prior written notice to Borrower and Lender. Such resignation shall take effect upon the acceptance by a successor Agent of appointment pursuant to clause (ii) below or as otherwise provided below.

(ii)    **Appointment of Successor**. Upon any such notice of resignation pursuant to clause (d)(i) above, Lender shall, upon receipt of Borrower's prior consent which shall not unreasonably be withheld, appoint a successor Agent. If a successor Agent shall not have been so appointed within said thirty (30) Business Day period, the retiring Agent, upon notice to Borrower, shall then appoint a successor Agent who shall serve as Agent until such time, as Lender, upon receipt of Borrower's prior written consent which shall not be unreasonably withheld, appoint a successor Agent as provided above.

(iii)   **Successor Agent**. Upon the acceptance of any appointment as Agent under the Loan Documents by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under the Loan Documents. The former Agent shall promptly transfer all Collateral held by it as Agent to the successor Agent.

(e)     **Confirmation of Authority; Execution of Releases**. Without in any manner limiting Agent's authority to act without any specific or further authorization or consent by Lender, Lender agrees to confirm in writing, upon request by Borrower, the authority to release any property covered by this Agreement or the Loan Documents. So long as no Default is then continuing, upon receipt by Agent of confirmation from Lender of its authority to release any particular item or types of property covered by this Agreement or the Loan Documents, and upon at least five (5) Business Days' prior written request by Borrower, Agent shall (and is hereby irrevocably authorized by Lender to) execute such documents as may be necessary to evidence the release of the Liens granted to Agent for the benefit of Lender herein or pursuant hereto upon such Collateral; provided, however, that (i) Agent shall not be required to execute any such document on terms which, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Liens upon (or obligations of any Loan Party, in respect of) all interests retained by any Loan Party, including, without limitation, the proceeds of any sale, all of which shall continue to constitute part of the property covered by this Agreement or the Loan Documents.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, Grantors, Agent and Lender have executed this Loan, Guaranty and Security Agreement as of the day and year first above written.

**GRANTORS:**

**JN MEDICAL CORPORATION,**
a Nebraska corporation

By: _Jee R. Reddy_
Name: _Dr. Jeevi R. Reddy_
Title: _President_

_Jee. R. Reddy_

**JEERI R. REDDY**, individually, as Guarantor

**AGENT AND LENDER:**

**FULL CIRCLE CAPITAL CORPORATION**

By: _____
Name:   Gregg J. Felton
Title:   President and Co-Chief Executive Officer

{00892255;3}

**IN WITNESS WHEREOF**, Grantors, Agent and Lender have executed this Loan, Guaranty and Security Agreement as of the day and year first above written.

**GRANTORS:**

**JN MEDICAL CORPORATION,**
a Nebraska corporation

By: _____
Name: _____
Title: _____


_____
**JEERI R. REDDY**, individually, as Guarantor


**AGENT AND LENDER:**

**FULL CIRCLE CAPITAL CORPORATION**

By: _____
Name:   Gregg J. Felton
Title:    President and Co-Chief Executive Officer

## SCHEDULE

1. **Reserved**

2. **Reserved**

3. **Permitted Liens**

Part I

    Existing Liens and financing statements: **NONE.**

Part II

    Future Permitted Liens: **NONE.**

4. **Reserved**

5. **Reserved**

6. **Conditions To Funding of Term Loan**

    N/A

7. **Maturity Date**:      The Term Loan will mature and become due and payable, on the first Business Day date that is two (2) years after the Closing Date, as the same may be extended pursuant to Section 2(b) hereof.

8. **Interest Margin:**    Term Loan: Eleven percent (11.00%) per annum.

9. **Default Margin:**    Five percent (5.0%) per annum.

10. **Fees**

    a.    Upon execution of this Agreement, in consideration of Agent's structuring, approving and committing to this Agreement, but without affecting Borrower's obligation to reimburse Agent for costs associated with this Agreement and the transactions contemplated hereby as provided elsewhere in this Agreement, Borrower agrees to pay Agent the following fees for services rendered to date (the "*Fees*"): (1) an origination fee in the amount of $35,000 (the "*Origination Fee*"), which Origination Fee shall be payable concurrently with the initial advance of the Term Loan; this letter constitutes Borrower's irrevocable direction to Full Circle to use a portion of the proceeds of the Term Loan to pay the Origination Fee to Full Circle; and (2) an exit fee in the amount of $35,000 (the "*Exit Fee*"), which Exit Fee shall be payable on the earlier to occur of (i) the Maturity Date (as the same may be extended pursuant to the Option to Extend set forth in this Agreement), and (ii) concurrently with any repayment of all or any portion the principal amount of the Term Loan (with an amount equal to one percent (1.0%) of such principal repayment being due on account of such Exit Fee in the case of any partial repayment of the Term Loan). The foregoing shall be fully earned on the Closing Date and non-refundable when paid.

    b.    Term Loan Prepayment Premium:

| Pay Date | Premium |
|---|---|
| Closing Date to the last day of the month that is twelve (12) months after the Closing Date | An additional four percent (4%) of the principal amount prepaid. |
| The last day of the month that is twelve (12) months after the Closing Date to the last day of the month that is eighteen (18) months after the Closing Date | An additional two percent (2%) of the principal amount prepaid. |
| Thereafter | None |

All of the foregoing fees constitute compensation to Agent and Lender for services rendered and are not interest or a charge for the use of money. Each installment of such fees shall be fully earned when due and payable and shall not be subject to refund or rebate.

11.   **Organizational Information**

   **Exact Legal Name of Borrower:**  "JN MEDICAL CORPORATION"
   **State of Organization:** Nebraska
   **Type of Organization:** corporation
   **Organizational Identification Number:** 1668552

12.   **Subsidiaries and Investments in Other Persons:**

   **NONE.**

13.   **Pending Litigation:  NONE.**

14.   **Existing Debt and Guarantees of Borrower:**

   (a)   US Bank – line of credit for $60,000 (approximately $31,000 outstanding); and
   (b)   Letter of Credit reimbursement obligations re letter of credit for utilities deposit.

15.   **Prior Legal Names:** JN-International, Inc.

   **Prior or Current Trade or Fictitious Names:**

   **JN – INTERNATIONAL MEDICAL CORPORATION**

   **Mergers and Acquisitions:** None.

16.   **Locations of Offices and Collateral:**

   Offices: 2720 North 84th Street, Omaha, Nebraska  68134
   Collateral:  2720, 2721 & 2728 North 84th Street, Omaha, Nebraska  68134 (all as more fully described in the Mortgage)

   **Current Chief Executive Office of Borrower:**

   Same as above

   **Other Current Collateral Locations:**

   NONE.

{00892255;5}

Case 17-80174-TLS   Doc 22   Filed 03/03/17   Entered 03/03/17 18:21:58   Desc Main
Document   Page 55 of 102

17.   **Ownership Structure:** Borrower has authorized 36,000 shares of common stock, as follows:

| Stockholder | # of Shares: |
|---|---|
| Dr. Jeeri Reddy | 7,400 |
| Aramalla Purnachandra | 3,600 |
| Dr. Rajender Reddy | 2,500 |
| S.V. Investments, LLC | 1,896 |
| H. Rajender Reddy, as trustee of the Hanumandla Reddy Family Trust | 1,000 |
| SVI Defined Benefit | 497 |
| Sambabiva R. Venigalla | 200 |
| Dr. Babu S. Bangaru | 110.80 |
| Silpa Maruri | 100 |
| Dr. Jaykumar R. Kambam | 100 |
| *Total Issued* | 17,403.80 |
| | |
| *Authorized but not issued* | 18,596.20 |
| ***TOTAL AUTHORIZED COMMON STOCK*** | 36,000.00 |

18.   **Owned Real Property:**

2720, 2721 & 2728 North 84th Street, Omaha, Nebraska  68134 (all as more fully described in the Mortgage)

**Leased Real Property (including legal name of landlord and monthly rent):**

None.

**Warehousemen, processors, consignees or other bailees in possession or control of any Inventory (include name, address where Inventory is stored and description of the arrangement):**

None.

19.   **Reserved.**

19A.   **Intellectual Property:**  U.S. Patents No. 7,491,517 and No. 8,129,147.

19B.   **Labor Matters.**  None.

20.   **Commercial Tort Claims:**  None.

21.   **Reserved.**

22.   **Reserved.**

23.   **Reserved.**

24.   **Reserved.**

25.    **Annual Financial Statements**:  To be reviewed by an independent practicing certified public accountant reasonably acceptable to Agent.

27.    **Inspections**:  Borrower agrees to pay to Agent's customary fees and disbursements arising out of any inspections of Borrower's premises, records and business.

28.    **Cross Default Amount**:  $25,000 with respect to Borrower and $50,000 with respect to Guarantor.

29.    **Judgment Cross Default Amount**:  $25,000 with respect to Borrower and $50,000 with respect to Guarantor.

30.    **Reserved**.

31.    **Notice Addresses**:

| | |
|---|---|
| If to Grantors: | JN Medical Corporation<br>2720 North 84th Street<br>Omaha, Nebraska 68134 |
| | Dr. Jeeri R. Reddy<br>24342 Howard Circle<br>Waterloo, Nebraska 68069 |
| With a copy to (which shall not constitute notice): | Howard L. Neuhaus, Esq.<br>3934 North 90th Street<br>Omaha, Nebraska 68134 |
| If to Agent or Lender: | Full Circle Capital Corporation, as Agent<br>800 Westchester Avenue, Suite S-620<br>Rye Brook, NY 10573<br>Attn.:  Brian J. Neilinger |
| With a copy to (which shall not constitute notice): | Cassin & Cassin LLP<br>1880 Century Park East, Suite 510<br>Los Angeles, California 90067<br>Attn:  William C. Seligman, Esq. |

**EXHIBIT A**

**FUNDS FLOW MEMORANDUM**

{copy attached}

| | | |
|---|---|---|
| Lender Gross Loan Proceeds | $ | 3,500,000.00 |
| Less: Interest Reserve | | 390,000.00 |
| Less: Lender Fees & Out of Pocket (A) | | 72,200.00 |
| Less: Third Party Expenses (B) | | 140,950.94 |
| Plus: Diligence Deposit | | 15,000.00 |
| Plus: Legal Deposit | | 20,000.00 |
| Equals: Lender Net Loan Proceeds to Borrower | $ | 2,931,849.06 |

**(A)**
Lender Fees

| | | |
|---|---|---|
| Structuring Fee @ 1.00% | | 35,000.00 |
| Closing Fee @ 1.00% | | 35,000.00 |
| Site Inspection Expenses | | 2,200.00 |
| Post Closing Obligation | | - |
| Total | $ | 72,200.00 |

**(B)**
Third Party Expenses

| | | |
|---|---|---|
| Broker: Anil Dang | | 70,000.00 |
| Legal: Cassin & Cassin LLP | | 20,000.00 |
| Background Check:  Padic Inc | | 700.00 |
| Appraisal: BBG | | 6,000.00 |
| Env & Property Report: Aaron & Wright | | 4,400.00 |
| Title Report: First American Financial Corporation | | 6,945.00 |
| Tax Payment to Douglas County Treasurer | | 32,905.94 |
| Total | $ | 140,950.94 |

## **EXHIBIT B**

### **PURCHASE AGREEMENT**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of February 3, 2017, is entered into by and between Great Elm Capital Corp., a Maryland corporation ("***Seller***") and Auro Vaccines, LLC, a Delaware limited liability company ("***Buyer***" and together with the Seller, the "***Parties***" and each a "***Party***").

## RECITALS:

WHEREAS, on June 30, 2014, Full Circle Capital Corporation ("***FCC***") lent the principal amount of $3,500,000 to JN Medical Corporation ("***Borrower***"), which loan is evidenced by that certain Term Loan Note, dated June 30, 2014 (the "***Note***"), and is secured in accordance with that certain Loan, Guaranty and Security Agreement, dated as of June 30, 2014, by and among FCC (both as Lender and Agent), Borrower, and Dr. Jeeri R. Reddy (as Guarantor) (the "***Loan***");

WHEREAS, on February 6, 2016, the Loan went into default for non-payment, after which FCC commenced foreclosure proceedings on a portion of the assets securing the Loan;

WHEREAS, FCC merged with and into Seller on November 3, 2016 (the "***Merger***"), whereupon Seller acquired by operation of law all rights and obligations of FCC, including FCC's rights in and to the Loan, the Loan Documents and the Foreclosed Assets (defined below); and

WHEREAS, Seller now wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, the rights and obligations of Seller in and to the Purchased Assets (defined below), subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
### PURCHASE AND SALE

**Section 1.01   Purchase and Sale.**

(a)      Subject to the terms and conditions set forth herein, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in the real property set forth on Schedule 1.01(a) attached hereto (the "***Foreclosed Assets***").

(b)      Subject to the terms and conditions set forth herein, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in the Loan, including all security interests, mortgages, assignments, UCC financing statements, collateral assignments, indemnities, agreements and any and all other

written instruments or documents evidencing, securing, perfecting or otherwise pertaining to the Loan (collectively, the "***Loan Documents***" and together with the Loan and the Foreclosed Assets, the "***Purchased Assets***").

### Section 1.02   Purchase Price; Allocation.

(a)    The aggregate purchase price for the Purchased Assets shall be $3,000,000, subject to adjustment as set forth in Section 6.02 (as adjusted, the "***Purchase Price***").  The Buyer shall pay the Purchase Price to Seller at the Closing (as defined herein) in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions provided by the Seller.

(b)    The Parties agree that $1,500,000 of the Purchase Price shall be allocated as the purchase price for the Foreclosed Assets, with the remainder of the Purchase Price to be allocated among the other Purchased Assets in accordance with a purchase price allocation schedule to be mutually agreed upon by the Parties within 90 days following the Closing.

### ARTICLE II
### CLOSING

**Section 2.01    Closing.** The closing of the transactions contemplated by this Agreement (the "***Closing***") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "***Closing Date***"). The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. (Central Time) on the Closing Date.

### Section 2.02    Closing Deliverables.

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    a special warranty deed conveying to the Buyer fee simple title to the Real Property (defined below) (the "***Special Warranty Deed***");

(ii)    a bill of sale in form reasonably satisfactory to the Buyer and the Seller transferring to the Buyer any tangible personal property that may have been foreclosed on in the Foreclosure Proceedings (as defined below) (the "***Bill of Sale***");

(iii)    an assignment and assumption agreement in the form reasonably satisfactory to the Buyer and Seller effecting the assignment to, and assumption by, Buyer of the Purchased Assets not conveyed by the Special Warranty Deed or the Bill of Sale, including the Loan (the "***Assignment and Assumption Agreement***" and, together with the Special Warranty Deed and the Bill of Sale, the "***Ancillary Agreements***");

(iv)    the original Note, which shall be delivered to and received by the Buyer within two business days following the Closing;

2

(v)      copies of any applicable UCC-3 financing statements filed by Seller amending financing statements previously filed by FCC with respect to the collateral purportedly securing the Loan; and

(vi)      such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be reasonably required to give effect to this Agreement.

(b)      At the Closing, Buyer shall deliver to Seller the following:

(i)      the Purchase Price; and

(ii)      the Assignment and Assumption Agreement duly executed by Buyer; and

(iii)      payment of $43,258.37, representing the full amount due to Seller as a reimbursable expense payable by Aurobindo Pharma USA, Inc. ("*Aurobindo*") in accordance with the Asset Purchase Agreement Term sheet dated January 20, 2017 between Seller and Aurobindo.

### Section 2.03   Consents to Certain Assignments

(a)      Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, this Agreement and the Ancillary Agreements shall not constitute an agreement to transfer or assign any asset, permit, claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party, would constitute a breach or other contravention under any agreement or law to which the Seller is a party or by which it is bound, or in any way adversely affect the rights of the Seller or, upon transfer, the Buyer under such asset, permit, claim or right.  The Seller shall use its commercially reasonable efforts to obtain any consents or waivers required to assign to the Buyer any Purchased Asset that requires the consent of a third party, without any conditions to such transfer or changes or modifications of terms thereunder.

(b)      If any such consent is not obtained prior to Closing and as a result thereof the Buyer shall be prevented by such third party from receiving the rights and benefits with respect to such Purchased Asset intended to be transferred hereunder, or if any attempted assignment would adversely affect the rights of the Seller thereunder so that the Buyer would not in fact receive all such rights or the Seller would forfeit or otherwise lose the benefit of rights that the Seller is entitled to retain, the Seller and the Buyer shall cooperate in any lawful and commercially reasonable arrangement, as the Seller and the Buyer shall agree, under which the Buyer would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer; provided, that all reasonable out-of-pocket expenses of such cooperation and related actions shall be paid by the Buyer.  The Seller shall promptly pay to the Buyer when received all monies received by the Seller under such Purchased Asset or any claim or right or any benefit arising

thereunder and the Buyer shall indemnify and promptly pay the Seller for all liabilities of the Seller associated with such Purchased Asset.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this <u>Article III</u> are true and correct as of the date hereof.

**Section 3.01   Organization and Authority of Seller; Enforceability.** Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Maryland. Seller has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

**Section 3.02   No Conflicts; Consents.** The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller or the Purchased Assets; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under the Loan Documents or any other material contract or other instrument to which Seller is a party, or to which any of the Purchased Assets are subject other than those conflicts, defaults or violations set forth on Schedule 3.02(c) hereto; or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets.  No consent, approval, waiver or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby.  For purposes of this Agreement, "***Encumbrance***" means any charge, claim, mortgage, title defect, lien, option, pledge, security interest or other restriction of any kind.

**Section 3.03   Absence of Legal Proceedings**.  There are no actions, claims, lawsuits or other legal proceedings pending or, to the knowledge of Seller threatened, contesting or relating to: (i) the amount due under the Loan Documents, (ii) the validity or priority of the security

interests granted under the Loan Documents, (iii) the validity of the Foreclosure Proceedings, (iv) the Seller's title to the Purchased Assets, or (v) the transactions contemplated herein.

### Section 3.04   Purchased Assets.

(a)      Seller has provided the Buyer with true and correct copies of the Loan Documents and all material correspondence thereunder, including waivers, amendments, notices of default and foreclosure notices.  The Loan is currently in default due to non-payment and has been in default at all times since the closing of the Merger.

(b)      Subject to "Permitted Encumbrances," Seller owns and has good title to the Purchased Assets, including, but not limited to, being the sole legal and beneficial owner and holder of the Loan and the Loan Documents and Seller's interest therein has not heretofore been sold, assigned, transferred, pledged or hypothecated.  For purposes of this Agreement, "***Permitted Encumbrances***" shall mean exceptions, restrictions, easements and other matters shown on the Standard Title Policy (defined below) that do not, in the aggregate, materially interfere with the present use of the Foreclosed Assets.

(c)      At the Closing, Seller will convey the Foreclosed Assets to Buyer in such condition that a mutually agreed title insurer is willing to issue to Buyer a ALTA standard owner's policy of title insurance (the "Standard Title Policy") with liability equal to the portion of the Purchase Price allocated to such Foreclosed Assets pursuant to Section 1.02 above, showing fee simple title to the Foreclosed Assets vested in Buyer, with such title coverages, endorsements or other assurances requested by Buyer, subject only to the Permitted Encumbrances.  If Buyer desires extended coverage or any title endorsements or other additions to the Standard Title Policy or any survey, or any lender's title insurance, Buyer shall be responsible for the incremental costs therefor.  Buyer shall pay for the cost of any such extended title coverages, endorsements, other assurances or survey desired by Buyer, except that Buyer and Seller shall each pay one half of the cost of the Standard Title Policy.

(d)      At Closing, Seller will deliver to Buyer good and marketable title to the Loan Documents, free and clear of all Encumbrances other than those Encumbrances set forth on Schedule 3.04(d) hereto.

(e)      This Agreement and the instruments and documents to be delivered by the Seller to the Buyer at or following the Closing shall be adequate and sufficient to transfer to the Buyer the Seller's entire right, title and interest in and to the Purchased Assets.

(f)      Except as set forth on Schedule 3.04(f), the Loan is secured by a valid and perfected first-priority security interest in the collateral described in the Loan Documents, to the extent that a security interest can be perfected in such collateral through the filing of a UCC-1 financing statement (the "***Collateral***").  The Collateral is, to the best of Seller's knowledge, located on the premises of the Foreclosed Assets. Buyer shall satisfy itself as to the existence of the Collateral and its location within the premises of the Foreclosed Assets, as well as to its condition. Seller makes no warranty as to its value, location or condition, and Buyer understands

that the Collateral comes "as is" and "with all faults." Seller specifically makes no warranty as to the title, condition or value of any intellectual property that may constitute part of the collateral described in the Loan Documents, including patents or patent rights.

(g)    On or about August 16, 2016, FCC acquired title to the Foreclosed Assets in a deed of trust sale under the Loan Documents (the "***Foreclosure Proceedings***"), with Seller acquiring title to the Foreclosed Assets from FCC on or about November 3, 2016 by operation of the Merger. Through the Foreclosure Proceedings, FCC credit bid the sum of $1,500,000, after giving effect to which, the outstanding obligations due under the Loan Documents, including interest and permitted expenses, as of the Closing is at least $2,750,000.

**Section 3.05    Non-foreign Status.** Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

**Section 3.06    Compliance with Laws.** Seller has materially complied, and is now materially complying, with all applicable federal, state and local laws and regulations applicable to ownership and use of the Purchased Assets and the conduct of the Foreclosure Proceedings.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this <u>Article IV</u> are true and correct as of the date hereof.

**Section 4.01    Organization and Authority of Buyer; Enforceability.** Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware. Buyer has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 4.02    No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Buyer;  (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer; or (c) conflict with, or result in (with or without notice or lapse of time or both) any

violation of, or default under any material contract or other instrument to which Buyer is a party, or to which the property of the Buyer is bound. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

## ARTICLE V
### COVENANTS

**Section 5.01   Public Announcements.** Unless otherwise required by applicable law (including, without limitation, applicable securities laws regarding quarterly disclosure of Seller's portfolio of investments), neither Party shall make any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed).

**Section 5.02   Transfer of Utilities to Buyer**.  Buyer and Seller shall cooperate to take all steps necessary to transfer all utilities related to the real property comprising the Foreclosed Assets, including, without limitation, electric service, gas service, telephone service, sewage, water and trash removal, into Buyer's name or as otherwise directed by Buyer as of Closing.

**Section 5.03   Bulk Sales Laws.** The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

**Section 5.04   Transfer and Property Taxes; Third-Party Liens.**

(a)     All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

(b)      Real estate taxes and personal property taxes on the Foreclosed Assets first becoming due in the year Closing occurs shall be treated as current taxes and shall be prorated as of the Closing.

**Section 5.05   Further Assurances.** Following the Closing, each of the Parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder.

# ARTICLE VI
## MISCELLANEOUS

**Section 6.01   Survival.** All representations, warranties, covenants and agreements contained herein shall survive for a period of one year following the Closing.

**Section 6.02   Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses, subject to Section 3.04(c) above with respect to the costs of the Standard Title Policy.

**Section 6.03   Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this <u>Section 6.03</u>):

| | |
|---|---|
| If to Seller: | Great Elm Capital Corp.<br>c/o Great Elm Capital Management, Inc.<br>200 Clarendon Street, 51st Floor<br>Boston, MA 02116<br>Attn: General Counsel |
| If to Buyer: | c/o Aurobindo Pharma USA Inc.<br>Swami S. Iyer<br>Chief Financial Officer<br>279, Princeton Hightstown Road<br>East Windsor, NJ  08520-1401 |
| With copies to (which shall not constitute notice): | Gibson, Dunn & Crutcher, LLP<br>555 Mission Street, Suite 3000<br>San Francisco, CA 94105<br>Attn: Ryan A. Murr |
| | McGrath North Mullin & Kratz, PC<br>1601 Dodge St., Suite 3700<br>Omaha, NE 68102<br>Attn: Michael T. Eversden |

8

**Section 6.04   Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 6.05   Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 6.06   Entire Agreement.** This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

**Section 6.07   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns. Neither Party may assign its rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning Party of any of its obligations hereunder.

**Section 6.08   No Third-party Beneficiaries.** This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 6.09   Amendment and Modification.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto.

**Section 6.10   Waiver.** No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 6.11   Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Nebraska without giving effect to any choice or conflict of law provision or rule (whether of the State of Nebraska or any other jurisdiction).

**Section 6.12   Submission to Jurisdiction.** Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Nebraska, in each case located in Omaha, Nebraska.  Each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

**Section 6.13   Waiver of Jury Trial.** Each Party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 6.14   Specific Performance.** The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 6.15   Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 6.16   Cumulative Remedies.** The rights and remedies provided in this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

*        *        *

10

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

GREAT ELM CAPITAL CORP.

By: _____
Name: Adam Kleinman
Title: Authorized Signatory


AURO VACCINES, LLC

By: _____
Name:  Swami S. Iyer
Title:   Chief Financial Officer

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

GREAT ELM CAPITAL CORP.

By: _____
Name:
Title:

AURO VACCINES, LLC

By: _____
Name:  Swami S. Iyer
Title:   Chief Financial Officer

# DISCLOSURE SCHEDULES

Dated as of February 3, 2017

# <u>INTRODUCTION</u>

This document is the disclosure schedules (the "<u>Schedules</u>") referred to in the Asset Purchase Agreement (the "<u>Agreement</u>"), dated February 3, 2017, by and among Great Elm Capital Corp., a Maryland corporation ("<u>Seller</u>"), and Auro Vaccines, LLC, a Delaware limited liability company ("<u>Buyer</u>").   Capitalized terms used herein but not otherwise defined will have the respective meanings assigned to such terms in the Agreement.

These Schedules have been prepared in accordance with the terms and subject to the conditions of the Agreement. The information provided in these Schedules is provided solely for the purpose of making disclosures to Buyer under the Agreement. Except as set forth in the Agreement, in no event will the disclosure of matters in these Schedules broaden Seller's representations and warranties, obligations, covenants, agreements or conditions contained in the Agreement. Furthermore, the disclosure of a particular item of information in these Schedules as an exception to a representation or warranty will not be taken as an admission by any party to the Agreement that such item (or any non-disclosed item or information of comparable or greater significance) represents a material exception or fact, event or circumstance, or is required to be made under the terms of any such representation or warranty. No disclosure in these Schedules relating to any possible breach or violation of any agreement or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

Notwithstanding anything to the contrary contained in these Schedules or in the Agreement, items disclosed in one Section of these Schedules shall be considered to be disclosed for purposes of all other Sections of these Schedules to the extent that the relevance of any such disclosure to any other Section of these Schedules is reasonably apparent on the face of such disclosure.

Where there is any inconsistency between the contents of any document supplied to Buyer or any of its affiliates by the Seller or any of its affiliates (including any document referred to in these Schedules) and the information contained in these Schedules, the information contained in these Schedules is to be taken as being correct, unless otherwise stated in these Schedules.

Titles and headings used herein are for convenience of reference only and will not in any manner affect the construction of these Schedules. The information contained in these Schedules is as of the date of the Agreement.

## Section 1.01(a)

Real property in the County of Douglas, State of Nebraska, described as follows, together with the following (collectively, the "***Real Property***"): (i) all buildings and structures thereon, (ii) all fixtures, (iii) all improvements; (iv) any and all rights, titles, powers, privileges, easements, licenses, rights-of-way and interests appurtenant to and which benefit the Real Property and/or the improvements, and (v) all equipment permanently attached to the Real Property:

- Lots 22, 23, 24, 25, 26, 27, 28, 29, 30 and 31, in Block 4, in West Benson, an Addition to the City of Omaha, in Douglas County, Nebraska, together with the East Half (E ½) of the vacated alley adjacent to said Lots on the West; and together with the South Half (S ½) of the vacated alley adjacent to said Lot 31 on the North; and

- The South Half (S ½) of Lot 12 and All of Lots 13, 14, 15, 16 and 17, in Block 5, In West Benson, an Addition to the City of Omaha, in Douglas County, Nebraska, together with the West Half (W ½) of the vacated alley adjacent thereto on the East; and

- Lots 14 and 15, in Block 4, in West Benson, an Addition to the City of Omaha, in Douglas County, Nebraska, and the West Half (W½) of the vacated alley adjoining said premises on the East.

2

**Section 3.02(c)**

To the extent deemed to be a breach, violation or default of Section 17 of the Loan Agreement, resignation of the existing Agent under the Loan Agreement and appointment of a replacement Agent under the Loan Agreement, in each case, as contemplated under the Assignment and Assumption Agreement.

**Section 3.04(d)**

Purchase-money lien in favor of Thermo Fischer Financial Services, Inc., filed February 23, 2015, relating to outstanding indebtedness in the amount of $3,028.74.

**Section 3.04(f)**

1.  All patents, patent rights or patentable inventions.

2.  All items described as Collateral under the Loan Agreement which do not in fact exist, cannot be located, or are owned by someone other than Borrower.

*      *      *

# **EXHIBIT C**

## **ASSIGNMENT AGREEMENT**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "*Assignment*") is made and delivered as of February 3, 2017 (the "*Effective Date*"), by and between Great Elm Capital Corp., a Maryland corporation ("*Assignor*") and Auro Vaccines LLC, a Delaware limited liability company ("*Assignee*"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement (as hereinafter defined).

## BACKGROUND:

**WHEREAS**, the Seller and the Buyer have entered into that certain Asset Purchase Agreement, dated as of February 3, 2017 (the "*Agreement*"), which provides for, among other things, the purchase and assumption by the Buyer of the Purchased Assets.

**WHEREAS**, Assignor holds legal record and beneficial ownership of certain of the assets as set forth on <u>Exhibit A</u> hereto (the "*Seller Assigned Assets*").

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

      1.    *Assignment; Resignation as Agent*.  In accordance with and subject to the terms of the Agreement, Assignor hereby assigns, transfers, conveys and delivers to Assignee all of Assignor's right, title and interest in and to the Seller Assigned Assets.  Except as expressly provided herein or in the Agreement, (a) such assignment, transfer, conveyance and delivery is made without representation or warranty by Assignor and (b) from and after the Effective Date, Assignor shall have no rights or obligations under the Loan Documents.  Effective as of the later of the Effective Date or the effectiveness of the appointment of the Buyer as "Agent" under the Loan, the Seller hereby resigns as Agent.

      2.    *Acceptance and Assumption; Appointment as Agent*.  In accordance with and subject to the terms of the Agreement, Assignee hereby: (a) purchases, acquires and accepts the assignment, transfer, conveyance and delivery of all of Assignor's right, title and interests in and to the Seller Assigned Assets, and (b) accepts its appointment as Agent under the Loan.

      3.    *Further Assurances; Indemnity*.

(a)    Each of the parties hereto covenants and agrees, at its own expense, to execute and deliver, at the request of the other party hereto, such further instruments of transfer and assignment and to take such other action as such other party may reasonably request for the purpose of carrying out or evidencing any of the transactions contemplated by this Assignment. For the avoidance of doubt, this includes, but is not limited to, ensuring the delivery of any and all instruments and completion of any and all actions reasonably necessary to appoint Buyer as a successor Agent under the Loan or to empower Buyer to act as such Agent or on such Agent's behalf, as such term is defined in the Loan.

(b)    To the extent that the appointment of the Buyer as Agent is not contemporaneous with the Effective Date, then the Seller shall, and hereby does, appoint Buyer as its exclusive agent,

authorized and empowered solely to act in Seller's behalf as Agent under the Loan, and Seller hereby delegates to the Buyer all rights of the Agent under the Loan.

(c)      In the event that Buyer takes any actions pursuant to the foregoing delegation of authority, the Buyer shall indemnify and hold harmless the Seller from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Seller in any way relating to or arising out of Buyer's exercise of such delegated rights.

(d)      Nothing in this Assignment shall be deemed a termination of the provisions of, or the Seller's rights in its capacity as Agent (in such capacity, the "Retiring Agent") under, the Loan Documents with respect to actions taken by the Retiring Agent prior to the Effective Date that are expressly stated in any section of any Loan Documents to survive the resignation of the Retiring Agent. For the avoidance of doubt, notwithstanding anything to the contrary contained in this Agreement or otherwise, the Retiring Agent and each affiliate thereof and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor and other consultants and agents of or to Seller or any of its affiliates shall retain the benefit of all of the provisions of the Loan Agreement and each of the other Loan Documents that are expressly stated in any section of any Loan Documents to survive the resignation of the Retiring Agent with respect to any actions taken or omitted to be taken prior to the Effective Date while the Retiring Agent was, or because the Retiring Agent had been, acting as the Agent under the Loan Agreement and the other Loan Documents. The Retiring Agent shall consult with the Successor Agent prior to exercising any of the rights referred to in this Section 3(d).

4.      **_Terms of Agreement_**.  The terms of the Agreement, including but not limited to Assignor's representations, warranties, covenants, and agreements relating to the Seller Assigned Assets, are incorporated herein by this reference.  Nothing in this Assignment shall itself change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Agreement in any manner whatsoever.  This Assignment does not create or establish liabilities or obligations not otherwise created or existing under, contemplated by or pursuant to the Agreement. Assignor acknowledges and agrees that the representations, warranties, covenants, and agreements contained in the Agreement shall not be superseded hereby but shall remain in full force and effect to the extent provided therein.  In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern.

5.      **_Governing Law_**.  This Assignment shall be governed by and construed in accordance with the internal laws of the State of Nebraska without giving effect to any choice or conflict of law provision or rule (whether of the State of Nebraska or any other jurisdiction).

*      *      *

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Assignment as of the date first written above.

AURO VACCINES LLC

By: _____

Name:   SWAMI S. IYER

Title:    CFO


GREAT ELM CAPITAL CORP.

By: _____

Name:  Adam Kleinman

Title:   Authorized Signatory


*[Signature Page to Assignment and Assumption Agreement]*

## <u>EXHIBIT A</u>

**Seller Assigned Assets**

All rights, title and interest in any of the Purchased Assets not conveyed by the Special Warranty Deed or the Bill of Sale, including the Loan.

## **EXHIBIT D**

**FULL CIRCLE FINANCING STATEMENT**

NE Sec of State John A Gale - UCC 01

9914738517-2                              Pgs: 7
JN MEDICAL CORPORATION
Filed: 07/07/2014 05:00 PM

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone: (800) 331-3282 Fax: (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)    17595 - CASSIN &

CT Lien Solutions
P.O. Box 29071          43962583
Glendale, CA 91209-9071     NENE

File with: Secretary of State, NE

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME
JN MEDICAL CORPORATION

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2720 North 84th Street | Omaha | NE | 68134 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME
FULL CIRCLE CAPITAL CORPORATION

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 800 Westchester Avenue, Suite S-620 | Rye Brook | NY | 10573 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
See Schedule A to UCC attached hereto and a part hereof.

SEE ATTACHMENTS

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
43962583          8307-002                                          Seligman, William

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

7 385 17-2

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
   because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| JN MEDICAL CORPORATION |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
    do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
|---|

OR

| 10b. INDIVIDUAL'S SURNAME |
|---|
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

11. ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☐ ASSIGNOR SECURED PARTY'S NAME:  Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the
    REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT:
    ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16
    (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:   43982583-NE-0   17395 - CASSIN & CASSIN LLP      FULL CIRCLE CAPITAL      File with: Secretary of State, NE      8307-002   Seligman, William
2720, 2721 & 2728 North 84th Street Omaha, NE 68134   County: Douglas

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

738517-2

## SCHEDULE "A" TO UCC

(a)    Land.  The real property described in Exhibit A attached hereto and made a part hereof (the "**Land**");

(b)    Additional Land.  All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise, be expressly made subject to the lien of the Security Instrument;

(c)    Improvements.    The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "**Improvements**");

(d)    Easements.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, rights of dower, rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)    Equipment.  All "Equipment" as such term is defined in the Loan Agreement, *provided,* however, that Equipment shall not include any property belonging to tenants under Leases (hereinafter defined) except to the extent that Borrower shall have any right or interest therein;

(f)    Fixtures.  All Equipment now owned, or the ownership of which is hereafter acquired, by Borrower which is so related to the Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Borrower's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**"); notwithstanding the foregoing,

{00897336;1}



738517-2

"Fixtures" shall not include any property which tenants are entitled to remove pursuant to Leases, except to the extent that Borrower shall have any right or interest therein;

(g)    Personal Property.    All furniture, furnishings, objects of art, machinery, goods, inventory, tools, supplies, appliances, general intangibles (including, without limitation, payment intangibles), contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever (including, without limitation, the Equipment, Accounts, Goods and Intangibles, as defined in the Loan Agreement) as defined in and subject to the provisions of the Uniform Commercial Code, whether tangible or intangible, other than Fixtures, which are now or hereafter owned by Borrower and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "**Personal Property**"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of the Security Instrument and all proceeds and products of the above;

(h)    Leases and Rents.    All leases, subleases or subsubleases, lettings, licenses, concessions or other agreements (whether written or oral and whether now or hereinafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, lettings, licenses, concessions or other agreements entered into in connection with such leases, subleases, subsubleases, lettings, licenses, concessions or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into (collectively, the "**Leases**"), whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, letter-of-credit rights, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including timber to be cut, all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code or any similar action under any other Creditors' Rights Law (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Obligations;

(i)    Condemnation Awards.    All awards which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(j)    Insurance Proceeds.    All insurance proceeds in respect of the Property under any Policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance policies, judgments, or settlements made in lieu thereof, in connection with a claim under any title insurance policy owned by Borrower or a casualty to the Property, and any unearned premiums in connection with any Policies;

{00897336.1}



738517·2

(k)    Tax Certiorari.  All refunds, rebates or credits in connection with reduction in Taxes or Other Charges charged against the Property;

(l)    Conversion.  All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, Insurance Proceeds and Awards, into cash or liquidation claims;

(m)    Rights.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Mortgagee in the Property;

(n)    Agreements.    All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(o)    Trademarks.    All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

(p)    Accounts/Intangibles.    All presently existing or hereafter arising accounts receivable due to any Grantor (including medical and health-care-insurance receivables), book debts, notes, drafts and acceptances and other forms of obligations now or hereafter owing to any Grantor, whether or not arising from the sale or lease of goods or the rendition of services by any Grantor (including any obligation that might be characterized as an account, contract right, general intangible or chattel paper under the UCC), all of each Grantor's rights in, to and under all purchase orders now or hereafter received by such Grantor for goods and services, all proceeds from the sale of Inventory, all monies due or to become due to any Grantor under all contracts for the sale or lease of goods or the rendition of services by such Grantor (whether or not yet earned) (including the right to receive the proceeds of said purchase orders and contracts), all Reserves and other reserve accounts or cash collateral held pursuant to this Agreement or any of the Loan Documents, all collateral security and guarantees of any kind given by any Loan Party with respect to any of the foregoing, all amounts payable to any Grantor under any insurance policy and all goods returned to or reclaimed by any Grantor that correspond to any of the foregoing, in each case together with all proceeds thereof (which are referred to in the Loan Agreement as the "**Accounts**") together with of Borrower's present and future general intangibles and all other presently owned or hereafter acquired intangible personal property of Borrower (including payment intangibles, all rights under insurance policies and any and all choses or things in action, goodwill, patents and patent applications, tradenames, servicemarks, trademarks and trademark applications, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, infringement claims, software, computer programs, computer discs, computer tapes, literature, reports, catalogs, deposit accounts, tax refunds and tax refund claims) other than Goods (as defined in the Loan Agreement) and Accounts, as well as Borrower's books and records relating to any of the foregoing (which are referred to in the Loan Agreement as the "**Intangibles**");

(q)    Proceeds.  All products and proceeds of any of the foregoing; and

{00897336;1}



738517-8

(r)    <u>Other Rights</u>.  Any and all other rights of Borrower in and to the items set forth in <u>Sections (a)</u> through <u>(q)</u> above.

All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Security Instrument.

{00897336;1}



7385172

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

Real property in the County of Douglas, State of Nebraska, described as follows:

Lots 22, 23, 24, 25, 26, 27, 28, 29, 30 and 31, in Block 4, in West Benson, an Addition to the City
of Omaha, in Douglas County, Nebraska, together with the East Half (E½) of the vacated alley
adjacent to said Lots on the West; and together with the South Half (S½) of the vacated alley
adjacent to said Lot 31 on the North;

And,

The South Half (S½) of Lot 12 and All of Lots 13, 14, 15, 16 and 17, in Block 5, in West Benson,
an Addition to the City of Omaha, in Douglas County, Nebraska, together with the West Half
(W½) of the vacated alley adjacent thereto on the East;

And,

Lots 14 and 15, in Block 4, in West Benson, an Addition to the City of Omaha, in Douglas County,
Nebraska, and the West Half (W½) of the vacated alley adjoining said premises on the East.

{00897336.1}



# **<u>EXHIBIT E</u>**

## **GREAT ELM FINANCING STATEMENT**

NE Sec of State-UCC

9817959704-0

Filed: 01/20/2017 04:17 p.m.

JN MEDICAL CORPORATION

Pg: 1 of 1

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

GLORIA A. TURNER (402-636-8257)

B. E-MAIL CONTACT AT FILER (optional)

GTURNER@BAIRDHOLM.COM

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐                                       ¬

⌐                                       ¬

L                                       ⌐

L                                       ⌐

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 9914738517-2 | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION**: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION**: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☑ **PARTY INFORMATION CHANGE**:

Check one of these two boxes:                    AND  Check one of these three boxes to:

This Change affects ☐ Debtor or ☑ Secured Party of record      ☑ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c      ☐ ADD name: Complete item 7a or 7b, and item 7c      ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| FULL CIRCLE CAPITAL CORPORATION | | | |
| OR  6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GREAT ELM CAPITAL CORP., (SUCCESSOR BY MERGER TO FULL CIRCLE CAPITAL CORPORATION) | | | |
| OR  7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 200 CLARENDON STREET, 51ST FLOOR | BOSTON | MA | 02116 | USA |

8. ☐ COLLATERAL CHANGE:  Also check one of these four boxes:   ☐ ADD collateral    ☐ DELETE collateral    ☐ RESTATE covered collateral    ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| FULL CIRCLE CAPITAL CORPORATION | | | |
| OR  9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

## EXHIBIT F

**AURO FINANCING STATEMENT**

NE Sec. of State-UCC
**9817965332-9**
**Filed: 02/15/2017 04:34 p.m.**
JN MEDICAL CORPORATION
Pg: 1 of 1

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
MICHAEL T. EVERSDEN (402-633-1526)

**B. E-MAIL CONTACT AT FILER (optional)**
RSANDERS@MCGRATHNORTH.COM

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 9914738517-2 | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, **and** address of Assignee in item 7c **and** name of Assignor in item 9
For partial assignment, complete items 7 and 9 **and** also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check _one_ of these two boxes:      **AND** Check _one_ of these three boxes to:

This Change affects ☐ Debtor _or_ ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; **and** item 7a or 7b **and** item 7c    ☐ ADD name: Complete item 7a or 7b, **and** item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only _one_ name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only _one_ name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME |
|---|
| AURO VACCINES, LLC |

| OR 7b. INDIVIDUAL'S SURNAME |
|---|
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)      SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2711 CENTERVILLE RD., SUITE 400 | WILMINGTON | DE | 19808 | USA |

8. ☐ **COLLATERAL CHANGE:** _Also_ check _one_ of these four boxes:    ☐ ADD collateral    ☐ DELETE collateral    ☐ RESTATE covered collateral    ☑ ASSIGN collateral
Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only _one_ name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME |
|---|
| GREAT ELM CAPITAL CORP., (SUCCESSOR BY MERGER TO FULL CIRCLE CAPITAL CORPORATION) |

| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

10. **OPTIONAL FILER REFERENCE DATA:**
NEBRASKA SECRETARY OF STATE

**FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)**

International Association of Commercial Administrators (IACA)

## **EXHIBIT G**

**SPECIAL WARRANTY DEED**

Return to:
David R. Madden, Esq.
McGrath North Mullin & Kratz, PC LLO
1601 Dodge Street, Suite 3700
Omaha, NE  68102

### SPECIAL WARRANTY DEED

GREAT ELM CAPITAL CORP., a Maryland corporation, GRANTOR, successor by merger to Full Circle Capital Corporation, in consideration of One Dollar ($1.00) and other good and valuable consideration received from GRANTEE, AURO VACCINES, LLC, a Delaware limited liability company, conveys to GRANTEE, the following described real estate (as defined in Neb. Rev. Stat. 76-201):

Refer to Exhibit "A" attached hereto and incorporated by reference herein.

GRANTOR covenants with GRANTEE that GRANTOR:

a.    is lawfully seised of such real estate and that it is free from encumbrances, subject only to those matters set forth on Exhibit "B" attached hereto and incorporated by reference herein;

b.    has legal power and lawful authority to convey the same; and

c.    warrants and will defend title to the real estate against the lawful claims of all persons claiming the same or any part thereof through, by or under Grantor.

### [Signature Page Follows.]

Executed:  February  3 , 2017.

GREAT ELM CAPITAL CORP., a Maryland
corporation

By: _____

Name: _____ADAM  YATES_____

Title: ____AUTHORIZED   SIGNATORY____

STATE OF _Massachusetts_ )

COUNTY OF _Suffolk_ )

    On this 3rd day of _February_____ , 2017, before me a Notary Public in
and for said county and state, personally appeared _Adam Yates_____ , known to
me to be the identical person who subscribed (his/her) name to the foregoing as _Authorized signatory_
of Great Elm Capital Corp., a Maryland corporation, and acknowledged the execution thereof to
be (his/her) voluntary act and deed and the voluntary act and deed of said corporation.

_____
(Notary Public

RICARDO ANTONIO MOLINA
Notary Public
Massachusetts
My Commission Expires
Aug 31, 2023

**[Signature Page to Special Warranty Deed.]**

## EXHIBIT "A"

The land referred to is situated in the State of Nebraska, County of Douglas and is described as follows:

Lots 22, 23, 24, 25, 26, 27, 28, 29, 30 and 31, in Block 4, in West Benson, an Addition to the City of Omaha, in Douglas County, Nebraska, together with the East Half (E½) of the vacated alley adjacent to said Lots on the West; and together with the South Half (S½) of the vacated alley adjacent to said Lot 31 on the North;

And,

The South Half (S½) of Lot 12 and All of Lots 13, 14, 15, 16 and 17, in Block 5, in West Benson, an Addition to the City of Omaha, in Douglas County, Nebraska, together with the West Half (W½) of the vacated alley adjacent thereto on the East;

And,

Lots 14 and 15, in Block 4, in West Benson, an Addition to the City of Omaha, in Douglas County, Nebraska, and the West Half (W½) of the vacated alley adjoining said premises on the East.

## EXHIBIT "B"

1.  Terms and conditions of Ordinance No. 31511, vacating alley, and reserving easements, filed June 9, 1988, as Book 851, Page 514, Official Records, Douglas County, Nebraska.

    Disclaimer and Release by the Omaha Public Power District filed on May 12, 1997, in Book 1209, Page 675, Official Records, Douglas County, Nebraska.

2.  Terms and conditions of Resolution, vacating alley, and reserving easements, filed February 25, 1957, in Book 318, Page 347, Official Records, Douglas County, Nebraska.

3.  Terms and conditions of Ordinance No. 29331, vacating alley, and reserving easements, filed December 4, 1980, in Book 643, Page 190, Official Records, Douglas County, Nebraska.

4.  Terms and conditions of the Waiver Agreement with Metropolitan Utilities District filed March 8, 1961, as Book 363, Page 599, Official Records, Douglas County, Nebraska.

5.  Terms and conditions contained in Warranty Deed filed February 3, 1930, in Book 510, Page 242, Official Records, Douglas County, Nebraska.

6.  Terms and conditions contained in the Warranty Deed filed February 3, 1930, in Book 510, Page 243, Official Records, Douglas County, Nebraska.

7.  Terms and conditions contained in the Warranty Deed filed May 10, 1926, in Book 510, Page 140, Official Records, Douglas County, Nebraska.

8.  Terms and conditions contained in Warranty Deed filed October 25, 1923, in Book 487, Page 189, Official Records, Douglas County, Nebraska.

9.  Terms and conditions contained in Warranty Deed filed October 25, 1923, in Book 487, Page 191, Official Records, Douglas County, Nebraska.

10. Terms and conditions contained in Warranty Deed filed January 11, 1924, in Book 388, Page 668, Official Records, Douglas County, Nebraska.

11. Terms and conditions contained in Warranty Deed filed June 20, 1925, in Book 510, Page 86, Official Records, Douglas County, Nebraska.

12. Terms and conditions of restrictions contained in Warranty Deed filed August 24, 1926, in Book 510 at Page 153, Official Records, Douglas County, Nebraska.

13. Terms and conditions of the Waiver Agreement with Metropolitan Utilities District filed June 14, 1955, in Book 299 at Page 73, Official Records, Douglas County, Nebraska.

14. Terms and conditions of the Environmental Covenant filed March 8, 2013, as Instrument No. 2013022717, Official Records, Douglas County, Nebraska.

15. Easement reserved in the Special Warranty Deed filed January 21, 2009 as Instrument No. 2009005402, Official Records, Douglas County, Nebraska.

16. Terms and conditions of the Revocable License Agreement with Metropolitan Utilities District filed October 23, 1944, in Book 193, Page 427, Official Records, Douglas County, Nebraska.

## **EXHIBIT H**

**BILL OF SALE**

# BILL OF SALE

This Bill of Sale (this "***Bill of Sale***") is made and delivered as of February 3, 2017, by Great Elm Capital Corp., a Maryland corporation (the "***Seller***"), for the benefit of Auro Vaccines LLC, a Delaware limited liability company (the "***Buyer***"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement (as hereinafter defined).

**WHEREAS**, the Sellers and the Buyer have entered into that certain Asset Purchase Agreement, dated as of February 3, 2017 (the "***Agreement***"), which provides, among other things, for the transfer of any and all tangible personal property that may have been foreclosed on in the Foreclosure Proceedings, as described in <u>Section 2.02(a)(ii)</u> of the Agreement (the "***Personal Property***").

**WHEREAS**, the Seller now wishes to convey ownership and title to the Personal Property, to the extent the Seller acquired rights to any such property in the Foreclosure Proceedings.

**NOW, THEREFORE,** in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     ***Transfer of Seller Assets***. The Seller does hereby grant, sell, convey, assign, transfer, and deliver to the Buyer all of the Seller's right, title and interest in and to the Personal Property, in each case, free and clear of any liens other than Permitted Encumbrances.

2.     ***Further Assurances***. The Seller covenants and agrees that, from time to time after the delivery of this Bill of Sale, it will, at the reasonable request of the Buyer: (a) take all steps reasonably necessary to establish the record of the Buyer's title (if applicable) to the Personal Property and (b) execute and deliver further instruments of transfer and assignment and take such other action, in each case, for the purpose of carrying out or evidencing any of the transactions contemplated by this Bill of Sale.

3.     ***Consideration***. The consideration for the Personal Property will be (or has been) paid under the Agreement pursuant to the terms of the Agreement.

4.     **The Personal Property is being conveyed to Buyer AS IS, WHERE IS and WITH ALL FAULTS. Except as expressly set forth in the Agreement, Seller makes no representations or warranties concerning the Personal Property. Seller disclaims all warranties express or implied with respect to the Personal Property, including, without limitation, warranties of title, merchantability or fitness for a particular purpose.**

5.     ***Terms of Agreement***. The terms of the Agreement, including but not limited to Seller's representations, warranties, covenants, and agreements relating to the Personal Property, are incorporated herein by this reference. Nothing in this Bill of Sale shall itself change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Agreement in any manner whatsoever. This Bill of Sale

does not create or establish liabilities or obligations not otherwise created or existing under, contemplated by or pursuant to the Agreement.  The Seller acknowledges and agrees that the representations, warranties, covenants, and agreements contained in the Agreement shall not be superseded hereby but shall remain in full force and effect to the extent provided therein.  In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern.

6.    ***Governing Law***.  This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of Nebraska without giving effect to any choice or conflict of law provision or rule (whether of the State of Nebraska or any other jurisdiction).

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Seller has caused this Bill of Sale to be executed and delivered as of the day and year first above written.

[Signature Page Follows]

2

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Seller has caused this Bill of Sale to be executed and delivered as of the day and year first above written.

GREAT ELM CAPITAL CORP.

By: _____

Name:  Adam Kleinman
Title:   Authorized Signatory