# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN RE: | CASE NO. BK 17-80174-TLS |
| JN MEDICAL CORPORATION, | CHAPTER 11 |
| Debtor. | |

## MOTION BY AURO VACCINES, LLC TO DISMISS THE CHAPTER 11 CASE

Auro Vaccines, LLC ("Auro"), a secured creditor of JN Medical Corporation (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Chapter 11 Case"), hereby moves (this "Motion") this Court for an order dismissing the Debtor's Chapter 11 Case pursuant to 11 U.S.C. § 1112(b). In support of this Motion, Auro respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Debtor's bad faith in commencing and prosecuting the Chapter 11 Case, combined with its complete inability to rehabilitate under chapter 11, requires dismissal pursuant to 11 U.S.C. § 1112(b).

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (G), and (O). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein include 11 U.S.C. §§ 105, and 1112(b).

**BACKGROUND**

**A.      The Loan Obligations**

4.      The Debtor and Auro are parties to a certain Loan, Guaranty and Security Agreement, dated as of June 30, 2014 (the "Loan Agreement"), pursuant to which the Debtor borrowed the principal amount of $3,500,000.  A copy of the Loan Agreement is attached as Exhibit A to the *Declaration of Swami S. Iyer in Support of the Motion by Auro Vaccines, LLC (I) to Dismiss the Chapter 11 Case, or (II) in the Alternative, for Relief from the Automatic Stay, or (III) in the Alternative, for Adequate Protection* (the "Iyer Declaration"), filed contemporaneously herewith.  (Doc. 22).

5.      Auro is not an original party to the Loan Agreement.  Auro acquired all of its rights and interests under the Loan Agreement from Great Elm Capital Corp. ("Great Elm").  Great Elm, in turn, acquired all of its rights and interest under the Loan Agreement from Full Circle Capital Corporation ("Full Circle"), the original lender and party to the Loan Agreement.

6.      On November 3, 2016, Great Elm succeeded to all of Full Circle's rights and interests under the Loan Agreement by operation of law pursuant to the merger of Full Circle with and into Great Elm, under that certain Agreement and Plan of Merger, dated as of June 23, 2016, between Full Circle and Great Elm (the "Full Circle Agreement").  A copy of the Full Circle Agreement is attached as Exhibit 2.1 to Full Circle's Current Report on Form 8-K filed with the U.S. Securities and Exchange Commission on June 27, 2016.[1]

7.      Effective February 3, 2017, Great Elm sold and assigned all of its rights and interests under the Loan Agreement to Auro pursuant to that certain Asset Purchase Agreement dated February 3, 2017 (the "Purchase Agreement") and that certain Assignment and

---

[1]  A copy of the Full Circle Agreement is available on the SEC's online EDGAR database at the following URL: https://www.sec.gov/Archives/edgar/data/1490013/000114420416109884/v442794_ex2-1.htm.

Assumption Agreement dated February 3, 2017 (the "Assignment Agreement"). Copies of the Purchase Agreement and the Assignment Agreement are attached as Exhibit B and Exhibit C, respectively, to the Iyer Declaration.

8. As of the Petition Date (defined below), the Debtor owed Auro the principal amount of at least $2,750,000, plus interest, fees, and costs (collectively, the "Loan Obligations") under the Loan Agreement.[2]

**B. The Collateral Securing the Loan Obligations**

9. The Loan Obligations are secured by a first-priority security interest in all of the Debtor's assets (collectively, the "Collateral"), as provided in the Loan Agreement. The Collateral consists of all personal property and all intellectual property.[3]

10. On July 7, 2014, Full Circle perfected its security in the Collateral, as evidenced by a Form UCC-1 Financing Statement (the "Full Circle Financing Statement") filed with the Nebraska Secretary of State in accordance with the Uniform Commercial Code (the "UCC") as adopted in Nebraska. A copy of the Full Circle Financing Statement is attached as Exhibit D to the Iyer Declaration. On January 20, 2017, Great Elm filed a Form UCC-3 Financing Statement (the "Great Elm Financing Statement") with the Nebraska Secretary of State in accordance with the UCC, amending the Full Circle Financing Statement to reflect the change in the secured party's name from Full Circle to Great Elm. A copy of the Great Elm Financing Statement is attached as Exhibit E to the Iyer Declaration. On February 15, 2017, Auro filed a Form UCC-3 Financing Statement (the "Auro Financing Statement" and together with the Full Circle

---

[2] Interest continues to accrue while the Loan Obligations remain outstanding. Auro will provide a current accounting of the Loan Obligations at or prior to the hearing on this Motion.

[3] For the purposes of this Motion, Auro is not seeking relief from stay with respect to any of the Debtor's patents or patent rights. However, Auro reserves all rights with respect to such assets.

3

Financing Statement and the Great Elm Financing Statement, the "UCC Financing Statements") with the Nebraska Secretary of State in accordance with the UCC, further amending the Full Circle Financing Statement to reflect the assignment of Great Elm's security interest in the Collateral to Auro. A copy of the Auro Financing Statement is attached as Exhibit F to the Iyer Declaration. Accordingly, Auro holds a valid, perfected, and enforceable security interest in the Collateral, in accordance with the Loan Agreement and as evidenced by the UCC Financing Statements.

**C.    Prepetition Foreclosure on the Real Property**

11.    Originally, the Loan was also secured by certain real property, including three buildings thereon, in Douglas County, Nebraska (collectively, the "Real Property"). However, after the Debtor defaulted on the Loan Agreement in 2016 for failure to repay the Loan Obligations on the maturity date,[4] Full Circle foreclosed on the Real Property pursuant to a valid non-judicial foreclosure sale and thereafter took ownership of the Real Property (the "Foreclosure Proceedings"). The Foreclosure Proceedings resulted in proceeds of $1,500,000, which were applied to expenses, interest and principal.

12.    On February 3, 2017, Auro acquired all of Full Circle's right, title, and interest in (a) the Real Property pursuant to the Asset Purchase Agreement and a certain special warranty deed dated February 3, 2017 (the "Special Warranty Deed"), a copy of which is attached as Exhibit G to the Iyer Declaration, and (b) any tangible personal property that Full Circle may have acquired in the Foreclosure Proceedings (collectively, the "Personal Property") pursuant to

---

[4] Pursuant to the Loan Agreement, the Loan Obligations became due on the "maturity date," which is defined as the first business day that is two (2) years after the loan was funded. *See* Loan Agreement § 1. In the *Declaration of Kevin Aramalla in Support of Filing* [Docket No. 16] (the "Aramalla Declaration"), the Debtor admits that it defaulted on the Loan Agreement. *See* Aramalla Declaration ¶ 14.

4

the Asset Purchase Agreement and a certain bill of sale dated February 3, 2017 (the "Bill of Sale"), a copy of which is attached as Exhibit H to the Iyer Declaration.

**D.    The Debtor's Prepetition Failure to Preserve Perishable Collateral**

13.    Auro is informed and believes that substantially all of the tangible Collateral is currently located on the Real Property and was not included in the Personal Property that Auro acquired from Great Elm. Among other things, the Collateral includes certain proprietary vaccines and related cultures (collectively, the "Vaccines"). Importantly, the Vaccines are valuable, perishable, and require special care, storage, and ongoing maintenance, which the Debtor has not provided since February 6, 2016 and is unable to provide.

14.    Specifically, the Vaccines must be properly stored at certain specified temperatures to ensure and protect their survival, quality, utility, potency, and safety. In accordance with guidelines promulgated by the U.S. Food and Drug Administration, the Vaccines must be stored in coolers or refrigerators set at 2-8° Celsius. Additionally, the Vaccines include certain live seed cultures that are stored in nitrogen tanks, which have to be refilled every 28 days to maintain these seed cultures. Given their fragility, these seed cultures are securely stored and must be handled with great care and precision.

15.    The Debtor has ceased operating its business and administering the Collateral—including the Vaccines. Since as early as February 6, 2016, the Debtor has made no effort to preserve the Collateral.

16.    Due to the Debtor's unwillingness or inability to protect the Collateral, Auro incurred costs and expenses in the aggregate amount of approximately $37,756 through February 22, 2017 related to the protection and preservation of the Collateral located on the Real Property—which includes costs for storage and the special care and maintenance required to preserve and maintain the Vaccines. *See* Iyer Declaration ¶ 17. The Loan Agreement authorizes

Auro to maintain the Collateral in the event that the Debtor is in default. *See* Loan Agreement § 13(b)(iv-v). Pursuant to the Loan Agreement, all costs and expenses already incurred and all future costs incurred by Auro in connection with preserving the Collateral are deemed to be included in the Loan Obligations secured by the Collateral. *See* Loan Agreement §§ 1, 13(b)(iv-v), 14(a).

**E.     No Legitimate Purpose for the Chapter 11 Case**

17.     On February 15, 2017 (the "Petition Date"), the Debtor filed its petition for relief [Docket No. 1] (the "Chapter 11 Petition") under title 11 of the United States Code (the "Bankruptcy Code").

18.     To date, the Debtor has taken no steps to pursue rehabilitation or reorganization, or even to treat the Chapter 11 Case as a substantive proceeding. For example, the docket is devoid of substantive pleadings or declarations.[5] The absence of traditional early motions— including those related to postpetition financing, use of cash collateral, sale of assets, or payment of any prepetition employee or trade obligations—speaks volumes. The Debtor has also failed to provide any roadmap from which the Court or the Debtor's creditors could conclude that the Debtor has any legitimate intent to reorganize.

19.     Moreover, the Debtor's Chapter 11 Petition itself reveals the lack of legitimate purpose for the Chapter 11 Case. First, in Section 13 of the Chapter 11 Petition, the Debtor admits that there will be no distributions available for unsecured creditors or equity holders. Second, the Debtor nowhere identifies its urgent need for financing or other relief to protect the perishable Vaccines, which are owned by the Debtor and constitute critical Collateral, stored on

---

[5] As of the date of this Motion, the Debtor has not filed any substantive pleadings except a retention application for its counsel [Docket No. 11], a motion to approve interim compensation procedures [Docket No. 10], and a motion for a 2004 exam of third parties [Docket No. 14].

6

the Real Property, and require ongoing maintenance and attention. In fact, in Section 12 of the Chapter 11 Petition, the Debtor checked the "No" box in response to the question that asked the Debtor whether it owns or is in possession of "any real property or personal property that needs immediate attention."

**F.    The Debtor's Postpetition Failure to Preserve Perishable Collateral**

20.    Since the Petition Date, the Debtor continues to be derelict in its obligations to protect and preserve the Collateral. Moreover, the Debtor does not appear to have any funds available to pay for the postpetition maintenance, insurance, and security that are all necessary to adequately preserve and protect the Collateral. In fact, the Debtor has admitted that it did not have sufficient funds to retain its counsel and that the Debtor's board of directors and shareholders will continue to fund the Debtor's legal expenses. *See* Aramalla Declaration ¶¶ 27-28. Furthermore, as noted above, the Debtor has not requested the Court's authority with respect to postpetition financing to ensure that it has the wherewithal to maintain the Collateral.

21.    Therefore, Auro must continue to protect, preserve, and maintain the Collateral located on the Real Property following the Petition Date. Auro projects additional ongoing costs for preserving, protecting, and maintaining the Collateral—including preserving and maintaining the Vaccines—in the amount of approximately $23,000 per month. *See* Iyer Declaration ¶ 19. These ongoing costs and expenses materially diminish the value of Auro's interest in the Collateral.

22.    Immediately prior to the Petition Date, Auro was preparing to commence enforcement actions against the Collateral on account of the Debtor's continuing defaults under the Loan Agreement. *See* Iyer Declaration ¶ 21.

23.    No business reason compelled the commencement of the Chapter 11 Case. Instead, it appears that the Debtor commenced the Chapter 11 Case to thwart Auro's ability to

assert its state law remedies against the Collateral under the UCC on account of the Debtor's continuing defaults. Absent the relief that Auro seeks, the Debtor will become more deeply administratively insolvent, the value of the Collateral—in particular, the Vaccines—will diminish, and Auro will continue to suffer substantial harm.

## ARGUMENT

**The Chapter 11 Case Should Be Dismissed Pursuant to 11 U.S.C. § 1112(b) to Prevent Continuing Loss to the Estate and Because the Debtor Has No Reasonable Likelihood of Rehabilitation and Filed the Chapter 11 Case in Bad Faith**

24. The Chapter 11 Case should be dismissed because (1) the Debtor has no likelihood of rehabilitation and the Debtor's estate is experiencing substantial and continuing loss, and (2) the Debtor filed the Chapter 11 Case in bad faith.

### *1. Dismissal Is Warranted to Prevent Continuing Loss to the Estate Because the Debtor Has No Likelihood of Rehabilitation*

25. The Bankruptcy Code provides that a court shall dismiss a chapter 11 case for "cause." 11 U.S.C. § 1112(b)(1). The Eighth Circuit explained that "[t]he purpose of § 1112(b)(1) is to 'preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.'" *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004) (quoting *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)).

26. Section 1112(b)(4) of the Bankruptcy Code provides a non-exhaustive list of examples that constitute "cause" for dismissal, including the "substantial or continuing loss to or diminution of the estate" and "the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). The Eighth Circuit in *Loop Corp.* explained that debtors who "had ceased their business operations but continued to incur administrative expenses, had a negative cash flow," fell within the parameters of Section 1112(b)(4): "[T]his negative cash flow

8

situation alone is sufficient to establish 'continuing loss to or diminution of the estate.'" *Id.* at 515-16 (citations omitted). The Eighth Circuit further explained that "[i]n the context of a debtor who has ceased business operations, any negative cash flow—including that resulting only from administrative expenses—effectively comes straight from the pockets of the creditors. This is enough to satisfy the first element of § 1112(b)(1)." *Id.* (citations omitted). Further, according to the Eighth Circuit, "[c]ourts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business." *Id.* at 516 (finding that debtors that ceased operations demonstrated no intention or likelihood of restoring the viability of their operations). *Id.*

27. The Chapter 11 Case falls squarely within the foregoing authorities. The Chapter 11 Case should be dismissed pursuant to 11 U.S.C. § 1112(b)(4)(A) to prevent substantial or continuing loss to or diminution of the Debtor's estate and because the Debtor has no reasonable likelihood of rehabilitation. The Debtor has ceased operating its business and has ceased maintain and administering the Collateral, including the Vaccines that require special care and maintenance. Notably, the Debtor has refused to provide the Court with sufficient information to protect the interests of third parties by failing to admit that certain of its most valuable assets (i.e., the Vaccines) require immediate attention.

28. But for the continued maintenance by Auro of the Collateral inside the Real Property—solely at Auro's significant cost and expense—such assets of the Debtor would lose significant value, diminish the Debtor's estate, and impair the Collateral. It is unreasonable, however, to expect Auro to continue to carry this burden, given that the Debtor admits it has defaulted on the Loan Agreement. *See* Aramalla Declaration ¶ 14.

29. Moreover, the Debtor has no reasonable likelihood of or prospects for rehabilitation and has offered no evidence to the contrary. The Debtor ceased operating its business and administering the Collateral, including some of its most valuable assets (i.e., the Vaccines), since at least February 6, 2016. The Debtor has admitted that it expects to be unable to make any distributions to unsecured creditors or equity holders. Notably, the Debtor has failed to file any motions normally associated with rehabilitation or distributions.

30. Because the Debtor continues to jeopardize the Collateral and will incur substantial administrative expenses during the pendency of the Chapter 11 Case without any reasonable likelihood of rehabilitation, the Chapter 11 Case should be dismissed to prevent continuing loss to the Debtor's estate.

### 2. *Dismissal Is Warranted Because the Debtor Filed the Chapter 11 Case in Bad Faith*

31. The Eighth Circuit has recognized that a bad faith filing constitutes "cause" for dismissal. *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.),* 235 F.3d 375, 379 (8th Cir. 2000) ("Section 1112(b) does not explicitly require that cases be filed in 'good faith,' but we have recognized that a bad faith filing can be cause for dismissal.") (citing *In re Kerr*, 908 F.2d 400, 404 (8th Cir. 1990)). "The good faith requirement 'is designed to prevent abuse of the bankruptcy process, or the rights of others, involving conduct or situations only peripherally related to the economic interplay between the debtor and the creditor community.'" *Id.* (quoting 7 COLLIER ON BANKRUPTCY ¶ 1112.07[1] (2000)) (emphasis added). The Eighth Circuit has explained that "[t]here is *no single test* for determining when a debtor has filed in bad faith. Rather, courts consider the *totality of the circumstances*, including the court's evaluation of the debtor's *financial condition*, *motives*, and the local *financial realities*." *Id.* at 379 (emphasis added). In particular, courts focus on evidence that a debtor filed its bankruptcy

10

petition "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir. 1988) (quoting *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir. 1984)).

32.　　Here, dismissal is warranted because the Debtor filed the Chapter 11 Case in bad faith. First, the Debtor admits it is in default on the Loan Agreement. *See* Aramalla Declaration ¶ 14. Second, the Debtor admits that it filed the Chapter 11 Case to protect its rights in the Collateral because it was concerned about the potentially imminent remedies that Auro may exercise given the Debtor's continuing default. *See id.* ¶¶ 29-30. Put another way, the Debtor filed the Chapter 11 Case to delay and frustrate Auro's efforts to pursue its state law remedies under the UCC with respect to the Collateral.

33.　　Moreover, the Debtor's bad faith is reinforced by its failure to, among other things, (i) provide the Court and all parties in interest with any information about the Debtor's intentions for the Chapter 11 Case, and (ii) file any substantive pleadings that are essential for a debtor in possession to continue to operate and to rehabilitate in bankruptcy. Thus, the record is devoid of any legitimate purpose for the Chapter 11 Case.

34.　　Accordingly, the Chapter 11 Case should be dismissed.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, Auro respectfully requests the entry of an order dismissing the Chapter 11 Case and granting such other and further relief as is just and proper.

DATED this 3rd day of March, 2017.

>Respectfully submitted,
>AURO VACCINES, LLC,
>a secured creditor
>
>By: */s/ Michael T. Eversden*
>Michael T. Eversden, Esq. #21941
>McGRATH NORTH MULLIN & KRATZ, PC LLO
>First National Tower
>1601 Dodge Street, Suite 3700
>Omaha, Nebraska 68102
>Telephone: (402) 341-3070
>Facsimile: (402) 341-0216
>meversden@mcgrathnorth.com
>
>– and –
>
>Robert A. Klyman
>Samuel A. Newman
>Sabina Jacobs
>GIBSON, DUNN & CRUTCHER LLP
>333 South Grand Avenue
>Los Angeles, California 90071
>Telephone: (213) 229-7000
>Facsimile: (213) 229-7520
>rklyman@gibsondunn.com
>snewman@gibsondunn.com
>sjacobs@gibsondunn.com