# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN RE: | CASE NO. BK 17-80174-TLS |
| JN MEDICAL CORPORATION, | CHAPTER 11 |
| Debtor. | |

**OBJECTION TO DEBTOR'S MOTION TO EXTEND 11 U.S.C. § 1121(c) DEADLINE**

Auro Vaccines, LLC ("Auro"), a secured creditor of the above-captioned debtor, JN Medical Corp. (the "Debtor"), hereby objects to the Debtor's Motion to Extend 11 U.S.C. § 1121(c) Deadline (Doc. 333) (the "Motion"), showing the Court as follows:

1. The Debtor cannot meet its burden with respect to the Motion. The Debtor has obtained more than ten months of exclusivity based on repeated promises that it was on the cusp of a lucrative licensing deal with a newly formed entity, JP Vaccines, LLC ("JP"). At this late date in the case, Auro's stated concerns about the speculative nature of the proposed licensing deal–which has been promised since the filing of this case—have proven true. Despite assuring the Court at the hearing on September 18, 2017 that counsel for the Debtor was to have a phone call on September 19, 2017 to work out "final edits" on the licensing deal to "put to bed the remaining terms/issues in the term sheet," and that the licensing deal would be "ready to go by the end of the month," (Doc. 323), the Debtor—now three months later—has still made no progress in getting the licensing deal done. In fact, the deal is apparently so uncertain that the Debtor is now contemplating other financing arrangements not previously disclosed to creditors, the terms of which are still unknown. (Doc. 333, p. 4). These developments underscore the entirely speculative nature of the Debtor's reorganization efforts in this case, as well as the futility of continuing the exclusivity period.

2. This case, which has been pending for more than ten months, is neither large nor complex. However, the Debtor has been unable to obtain financing sufficient to pay off its debts and instead holds the creditors hostage while the Debtor pursues a long-promised speculative and never-closing licensing arrangement for the benefit of the Debtor's stockholders. In fact, the case has been run as an option for those stockholders, while creditors have not received payment on their prepetition claims. Termination of exclusivity and denial of the Motion will not preclude the Debtor from continuing its quest to benefit stockholders; however, giving other parties in interest an opportunity to propose a plan will ensure prompt payment in full of allowed claims. Accordingly, Auro submits that the Debtor has failed to establish cause to extend the exclusivity period under 11 U.S.C. § 1121.

3. Section 1121(b) of the Bankruptcy Code allows a debtor a period of 120 days after the entry of an order for relief in which it alone may file a plan. *See* 11 U.S.C. 1121(b). If a debtor files a plan within that period, the debtor then has until 180 days after the order for relief to solicit acceptances of the plan. *See* 11 U.S.C. 1121(c)(3).

4. Once the exclusive period ends, any party-in-interest, including the debtor, may file a plan. *In re GMG Partners III, LP*, 503 B.R. 596, 600 (Bankr. S.D.N.Y. 2014).

5. Under Section 1121(d), the court may, on request of a party in interest, increase the exclusive periods provided in Section 1121(b) for cause. 11 U.S.C. 1121(d)(1).

6. The Debtor bears the burden of proving the existence of cause to extend the exclusivity period. *See In re GMG Partners III*, 503 B.R. at 601; *In re General Bearing Corp.*, 136 B.R. 361.

7. "The debtor must make a clear showing of 'cause' to support an extension of the exclusivity period." *In re Curry Corp.* 148 B.R. 754 (Bankr.S.D.N.Y. 1992). "Section 1121 was

designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *In the Matter of All Seasons Indus., Inc.*, 121 B.R. 1002, 1004 (Bankr.N.D.Ind. 1990).

8.  Courts have applied a number of factors in determining whether cause exists, including:

> (1) the size and complexity of the case; (2) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists.

*GMG Partners III*, 503 B.R. at 601 (quoting *In re Borders Group, Inc.*, 460 B.R. 818, 822 (Bankr.S.D.N.Y.2011)).

9.  The factors listed above weigh in favor of denying an extension of the exclusivity period in this case.

   a.  <u>Size and Complexity of Case</u>. This case is not large or complex. The Debtor admits its debt levels are not particularly high. (Doc. 306, p. 4). There is only one secured creditor, whose claim dwarfs the claims of all other creditors combined, and the total amount of the scheduled unsecured claims is only $186,743.66. The Debtor has no business operations, no revenues, and no employees whom it must decide whether to retain or discharge. (Doc. 98, 37:6-8; 37:24-38:1; Doc. 99, 6:21-23). It has only two unexpired equipment leases and no scheduled executory contracts that it must decide to assume or reject. (Doc. 53, Schedule G).

3

The Debtor attempts to manufacture "complexity" by pointing to its potential Chapter 5 causes of action, an objection to Auro's claim, and discovery. These issues do not justify continued exclusivity. First, these kinds of issues are present in virtually all Chapter 11 cases. Second, any plan that provides a recovery to stockholders will not have material chapter 5 litigation. Third, the Debtor's reference to the "shear (sic) amount of discovery" is misleading. The Debtor's work on discovery ended for the most part in May. While Auro sent two requests for production to the Debtor in early October, the Debtor has not seen fit to respond to them, so those discovery requests cannot be said to have been a burden to the Debtor since the last extension. Given that the Debtor has no business operations, there is really nothing that should have distracted it from its efforts to obtain financing, other than normal bankruptcy processes.

b.  <u>Time to Negotiate a Plan, Progress in Negotiations with Creditors</u>. In its latest extension request, the Debtor yet again claims that it "has filed its plan and has begun the process of negotiating with creditors on what, if any, changes to the plan might be needed." This statement is simply not true. Auro is the largest creditor in this case, yet even now the Debtor has not reached out to Auro about any changes to the plan. Further, the Debtor has not disclosed any such negotiations with any other creditor.

4

  c. <u>Good Faith Progress Toward Reorganization</u>. As evidence of good-faith progress toward reorganization, the Debtor points to its proposed plan and its non-binding term sheet ("Non-Binding Term Sheet") relating to a proposed licensing deal with JP. The Non-Binding Term Sheet was executed on <u>June 24, 2017</u>. It is now December 2017, and the Debtor still has no deal finalized, despite assuring the Court in September that the deal would be done by the end of that month. The Debtor has been negotiating with John McKay and JP Pharma, LLC/JP Vaccines, LLC for approximately <u>twelve months</u>. The Debtor's unfulfilled promise at the hearing in September is just the latest in a long pattern of the Debtor's giving and receiving numerous similar promises about the supposedly imminent closing of the proposed licensing deal, none of which have come true, including the following:

- In December 2016, McKay told Debtor's President, Kevin Aramalla, that he had hopes for getting a licensing deal done in early February, 2017. (Doc. 286, 247:6-9).

- On January 5, 2017, McKay sent Aramalla a message stating, "I am hoping to have this wrapped up even sooner than first expected." (Doc. 226).

- On January 25, 2017 McKay sent Aramalla and his father Purna a message stating: "…I am working toward paperwork early to middle of next week." (Doc. 227, p. 2).

- On February 3, 2017, McKay sent Aramalla a message stating, "We WILL BE FINISHED the week of the 12th." (Doc. 227, p. 1) (emphasis original).

- On February 21, 2017, McKay sent Aramalla a letter to Aramalla, stating: "We fully expect to be able to execute this deal with you in the coming weeks…Having completed adequate due diligence, we have

5

one last step before issuing the agreement which we expect to complete quickly." (Doc. 76).

- At the 341 Meeting on March 29, 2017, Aramalla testified that the negotiations for the licensing deal were "very close to the end" and the parties would be ready to sign "within a few weeks" (Doc. 99, 27:5-9)

- McKay told Aramalla he planned to sign the license contract the week of April 12, 2017 or the week following. (Doc. 98, 68:22-23)

- On April 20, 2017, McKay (through his lawyer) sent an unexecuted non-binding term sheet to the Debtor. (Doc. 189-1). McKay was telling Aramalla at the time that the deal would be done in mid-May. (Doc. 286, 247:10-24).

- On May 24, 2017, Aramalla testified that he anticipated signing a term sheet "this week or next." (Doc. 286, 197:18-23)

- McKay told Aramalla the licensing deal would be closed "within a week or two" after the term sheet was signed. (Doc. 286, 246:10-247:24).

- The non-binding JP Term Sheet was signed on June 24, 2017. (Doc. 295, p. 4).

Notwithstanding such promises, the licensing deal has only progressed to the stage of a Non-Binding Term Sheet and has now been stuck at that stage for six months. Moreover, the Non-Binding Term Sheet leaves critical issues for later negotiation, including:

- The Non-Binding Term Sheet does not specify the patents that that are to be licensed. Moreover, the Debtor's patent rights are subject to dispute, (Doc. 166), a fact which the Debtor has not mentioned.

- The Non-Binding Term Sheet states that the ultimate license agreement will contain "due diligence obligations and milestones on the part of JP Vaccines with respect to its research, development, commercialization of the Licensed Products in the Licensee Territory." It does not specify any of these obligations or milestones, which are thus still open for negotiation.

6

- The definition of "Net Sales", on which the royalty is calculated, is based on the difference between gross sales and deductions, but the parties have yet to agree on what the deductions will be.

- The Non-Binding Term Sheet indicates that the parties have not agreed upon how they will handle the issue of royalty stacking, and the Debtor's president has testified that he does not even know what that term means. (Doc. 286, 189:11-24).

- The Non-Binding Term Sheet contains two different formulations of the equity interest that is being granted to JP, one of which adds up to five percent, and the other of which adds up to four percent.

- The parties have yet to negotiate the type of clinical data set that will trigger the vesting to JP of 3-4% of the equity stake in the Debtor.

- The Non-Binding Term Sheet requires the Debtor to provide "expert support for the development of the Product," whereas the Debtor undisputedly has no employees and thus no ability to provide expert support. (Doc. 98, 37:24-38:1).

Moreover, the Debtor has no idea whether JP has reached a deal with a third-party foreign manufacturer to whom JP would sublicense the vaccines, despite the fact that the success of the Debtor's entire proposed licensing deal hinges on JP obtaining such a sublicense agreement. (Doc. 286, 247:25-248:3). The Debtor also has no idea of the financial wherewithal of JP or any third party to whom JP would sublicense the vaccines. (Doc. 286, 148:17-20, 187:15-18, 190:19-21). The Debtor does not even know the identity of the third party sublicensee on whom the success of the licensing deal depends, let alone that third party's financial condition. The Debtor cannot meet its burden by putting forward a plan that is based on such uncertainty.

The other pillar on which the Debtor's plan rests, namely, the proposed contribution from shareholders, is likewise illusory. The Debtor has tried for more than a year to raise funds from shareholders. (Doc. 16, ¶ 18, 19). For example:

- In mid-2016, Debtor's shareholders began to raise funds to pay off the loan from Full Circle Capital (now the Auro loan). (Doc. 16, ¶¶ 18, 19).

- In August 2016, the shareholders "put in a small amount…four hundred thousand", (Doc. 99, 26:5-11), which was insufficient to stave off Full Circle's foreclosure.

- The shareholders placed $1.35 Million in escrow in January 2017, (Doc. 16, p. 4), though that amount was later taken out of escrow. (Doc. 98, 28:3-4; 124:22-125:6).

- At the 341 Meeting held on March 29, 2017, Kevin Aramalla testified that the shareholders had contributed $1.35 Million and were expecting to contribute another $1.3-$1.4 Million to pay off the Auro loan. (Doc. 99, 18:6-23).

- Aramalla testified on April 12, 2017 that the shareholders had pledged to contribute $3 Million by April 17, 2017 "to take care of the [Auro] debt". (Doc. 98, 125:5-20).

- On April 18, 2017, the Debtor represented to the Court that its shareholders were in the "**final stages** of establishing an escrow account into which $1.3 million dollars **will almost immediately be placed**." (Doc. 182, p. 9) (emphasis added).

- The amount they actually placed in escrow was only $850,000, (Doc. 286, 153:2-17), though only two of them put in funds, and the escrowed funds were subject to withdrawal at the shareholders' whim. (Doc. 286, 153:3-17, 155:11-19; Doc. 190, p.1).

- No further funds were raised. (Doc. 286, 153:3-23)

In its Motion, the Debtor now introduces another element to try to save its collapsing reorganization prospects, namely, that the "Debtor is also

8

actively courting investment opportunities and exit financing opportunities." (Doc. 333, p. 4). This possibility was not disclosed in the Debtor's disclosure statement, and no details are given in the Debtor's Motion.

Thus, none of what the Debtor has described in its Motion shows good-faith progress toward reorganization.

d. <u>Whether the Debtor is Paying its Bills</u>. The Debtor has begun reimbursing Auro for its expenses in maintaining the Debtor's assets. However, the Debtor has virtually no funds of its own and must therefore rely on continual infusions of cash from shareholders in order to pay its bills. (Doc. 98, 55:18-56:4, Doc. 69 (showing the Debtor had only $5,339.61 in cash on February 28, 2017); Doc. 298 (showing that the Debtor must pay $30,000 per month to reimburse Auro for use of Auro's facility and for expenses incurred in maintaining the Debtor's assets)). Furthermore, the Debtor decided unilaterally to short-pay for December, paying only $15,600, in clear breach of its obligation under the court-approved stipulation to pay $30,000 per month. (Doc. 298).

e. <u>A Viable Plan</u>. As noted above, the Debtor's plan is speculative and not viable.

9

f. <u>Amount of Time Elapsed</u>. Congress established the 120-day exclusivity period, believing that it was sufficient for a debtor to negotiate a settlement without unduly delaying creditors. *See In re GMG Partners III, LP*, 503 B.R. at 600 (citing H.R. Rep. No. 95-595, at 232 (1977)). Given that the Debtor has no business operation to distract it from negotiating with creditors or with a potential licensee, the Debtor has had plenty of time to negotiate the licensing deal that forms the backbone of its plan. Any extension would simply delay the inevitable and unduly delay creditors in getting their claims resolved. While the Debtor has been involved in litigation with Auro, "[t]he ordinary Chapter 11 debtor is expected to bring with it litigation, or the potential for it." *In the Matter of All Seasons Indus., Inc.*, 121 B.R. 1002, 1005 (Bankr.N.D.Ind. 1990) (finding that post-petition litigation did not weigh heavily in favor of extending the period of exclusivity). Moreover, the litigation of which the Debtor complains ended on June 8, 2017, which was less than four months after the petition date, not six months as the Debtor claims in its Motion. The Debtor has had six months since then to focus on finalizing its licensing deal or to find other financing, but the Debtor still has not been able to do so.

g. <u>Unresolved Contingency</u>. This factor refers to an event external to the case that must occur or not occur in order for the case to succeed. *In re GMG Partners III, LP*, 503 B.R. at 603. The Debtor's plan relies entirely on such unresolved contingencies:  For example, the success of its plan

10

depends entirely on JP's entering into a sublicensing transaction with an unknown third-party manufacturer and on that manufacturer coming up with $5 Million that JP will use to fund its upfront payment to the Debtor under the plan. There is no information in any filing in this case about the identity or financial wherewithal of this third party, nor about the prospects for a sublicensing transaction between JP and the third party actually occurring.

10. In making its determination in this case, this Court should be guided by the court in *In re GMG Partners III, LP*, 503 B.R. 596, 600 (Bankr. S.D.N.Y. 2014). In that case, the debtor, GMG, had no operations and its sole business was managing a portfolio consisting of stock in three technology companies, two of which had the potential to increase significantly in value. In considering whether to extend the exclusivity period, the court considered the factors listed above. The court noted that the debtor's case was small and uncomplicated, particularly because the debtor had no operations and aside from the portfolio had no significant assets that it had to decide whether to keep or sell. Likewise, the debtor had no executory contracts, no employees to decide to retain or discharge. The court lastly recognized the fact that the debtor had only a few creditors. Because there was no reason to delay the debtor's exclusivity any further, the court denied the debtor's motion. *See id.; see also In re General Bearing Corp.*, 136 B.R. 361 (Bankr.S.D.N.Y. 1992) (court denied motion to extend exclusivity period because case was not complex, the debtor lacked any equity in the estate, there were only two secured claimholders, financial information was readily available, negotiations with secured creditors had been ongoing since before the commencement of the case, and any further delay would be detrimental to creditors); *In re Curry Corp.*, 148 B.R. 754 (Bankr.S.D.N.Y. 1992) (case was not

complex, debtor offered no persuasive evidence why a plan could not have been promulgated within the 120-day exclusivity period).

11. This case falls squarely within *GMG*. Like the debtor in GMG, the Debtor in this case has no operations, and besides the vaccines and associated intellectual property it has no other significant assets that it has to decide whether to buy or sell. It has no significant executory contracts and only two unexpired equipment leases, no employees to decide to retain or discharge, and only a few creditors. As did the court in *GMG,* this court should deny the motion to extend exclusivity.

12. Not only do the factors discussed above weigh in favor of denying exclusivity, but there is an alternative to the Debtor's pie-in-the-sky efforts to reorganize that represents a better and far less speculative option for creditors. If this Court were to deny the Motion, Auro would propose a plan that would include an auction of the Debtor's assets, an opening bid that would include full payment of allowed claims, and a continued set of operations in Omaha, which would provide jobs for workers at the facility and give local vendors an ongoing viable customer.

13. Auro's plan, which would have certain financing and would be confirmable, would result in a much earlier and much more certain distribution to creditors. The Debtor's speculative reorganization efforts, on the other hand, are geared toward benefiting the shareholders, while placing all of the risk on creditors. To the extent the Debtor actually can line up financing, the Debtor will have every right to bid at the auction. In fact, the competitive process of an auction may force the Debtor and JP to finally resolve their speculative transaction for the benefit of all stakeholders.

14. To be sure, the Debtor would still be allowed to continue its efforts to confirm a plan if the exclusivity period were to end. "Denying [a motion to extend exclusivity] only affords

creditors their right to file the plan; there is no negative effect upon the debtor's co-existing right to file its plan." *In the Matter of All Seasons Industries, Inc.*, 121 B.R. 1002 (Bankr.N.D. 1990) (quoting *In re Parker Street Florist & Garden Center, Inc.*, 31 B.R. 206, 207 (Bankr.D.Mass. 1983). If both the Debtor and Auro propose plans, creditors would thus have a choice as to which plan would benefit them most and would be most likely to succeed.

15.     Thus, allowing the exclusivity period to expire would not present any undue hardship on any party in interest.

WHEREFORE, Aurobindo requests that the Court deny Debtor's motion to extend the exclusivity period under § 1121 and grant such other and further relief as this Court may deem just and proper.

DATED this 22nd day of December, 2017.

                              Respectfully submitted,
                              AURO VACCINES, LLC,
                              a secured creditor

By: */s/ Michael T. Eversden*
Michael T. Eversden, Esq. #21941
McGRATH NORTH MULLIN & KRATZ, PC LLO
First National Tower
1601 Dodge Street, Suite 3700
Omaha, Nebraska 68102
Telephone: (402) 341-3070
Facsimile: (402) 341-0216
meversden@mcgrathnorth.com

– and –

Robert A. Klyman
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
rklyman@gibsondunn.com

**CERTIFICATE OF SERVICE**

    The undersigned hereby certifies that the foregoing document  as served by electronic filing utilizing the Court's CM/ECF system which gave notification electronically upon all parties who have filed an appearance or motion by electronic filing in this case on this 22nd day of December, 2017.

                                                        */s/ Michael T. Eversden*